IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

DANNY HONEYCUTT, as personal
representative of the Estate of Nathan Thomas
Honeycutt,

                Plaintiff,

      v.

CLACKAMAS COUNTY SHERIFF'S
OFFICE *et al.*,

                Defendants.

Case No. 3:23-cv-00953-SB

**OPINION AND ORDER**

**BECKERMAN, U.S. Magistrate Judge.**

       This case stems from the fatal shooting of Nathan Honeycutt ("Honeycutt") following an

attempted traffic stop and physical confrontation with Clackamas County Sheriff's Office

("CCSO") deputies. Danny Honeycutt ("Plaintiff"), as the personal representative of his son's

estate, sued Clackamas County (the "County"), CCSO, and CCSO deputies under 42 U.S.C.

§ 1983 ("Section 1983") and Oregon law.[1] Plaintiff asserted Section 1983 claims for Fourth,

---

[1] There were four CCSO deputies involved in the Honeycutt incident, all of whom
Plaintiff names as defendants: Janson Bento ("Bento"), Matthew Roach ("Roach"), Evan
Sanders ("Sanders"), and Samuel Tharp ("Tharp") (together with the County and CCSO,
"Defendants").

PAGE 1 – OPINION AND ORDER

Eighth, and Fourteenth Amendment violations and municipal liability, and state law claims for negligence, assault, and battery.

After answering Plaintiff's complaint and engaging in discovery, Defendants moved pursuant to Federal Rule of Civil Procedure ("Rule") 56 for summary judgment on all of Plaintiff's claims. The Court has jurisdiction over this matter under 28 U.S.C. §§ 1331, 1343, and 1367, and the parties have consented to the jurisdiction of a magistrate judge under 28 U.S.C. § 636(c). For the reasons explained below, the Court grants Defendants' motion for summary judgment.

## BACKGROUND

The Court recites the facts in the light most favorable to the nonmoving party (i.e., Plaintiff), "noting when facts are disputed or when the account of events is based principally on the officers' descriptions." *Smith v. Agdeppa*, 81 F.4th 994, 997 (9th Cir. 2023). Where, as here, the record includes video evidence of the underlying events, the Court "view[s] the facts in the light depicted by the videotape.'" *Id.* (quoting *Scott v. Harris*, 550 U.S. 372, 381 (2007)); *see also Williamson v. City of Nat'l City*, 23 F.4th 1146, 1149 n.1 (9th Cir. 2022) (presenting the facts in the light most favorable to the nonmoving party but recognizing that in excessive force cases, courts "do not credit a party's version of events that the record, such as an unchallenged video recording of the incident, quite clearly contradicts" (quoting *Rice v. Morehouse*, 989 F.3d at 1112, 1120 (9th Cir. 2021))).

The events leading to Honeycutt's death occurred in the early morning hours of September 27, 2021, in Happy Valley, Oregon. (Decl. Evan Sanders Supp. Defs.' Mot. Summ. J. ("Sanders Decl.") ¶ 3, ECF No. 20.) Nine days earlier, CCSO's chief deputy, Jesse Ashby ("Ashby"), emailed all sworn and unsworn CCSO personnel announcing a change to CCSO's vehicle pursuit policy. (Decl. Kevin Lafky Supp. Pl.'s Resp. Defs.' Mot. Summ. J. ("Lafky

Decl.") ¶ 2 & Ex. 1 at 1, ECF No. 26.) Ashby explained that the County's sheriff, Angela Brandenburg ("Brandenburg"), was "refining her expectations" on when deputies were "allowed to engage in vehicle pursuits" and going forward, deputies could only engage in vehicle pursuits when there was "reasonable suspicion to believe the suspect committed a felony person crime or where the suspect's driving conduct, prior to the initiation of a stop, displays a willful disregard for the safety that reasonably places the public in immediate danger of serious bodily harm or death." (*Id.*) Ashby also explained that the new pursuit policy was "effective immediately." (*Id.*)

At the time of the Honeycutt incident, CCSO deputies Bento, Roach, Sanders, and Tharp had about two or two and a half years of experience. (*See* Sanders Decl. ¶¶ 2-3; Decl. Janson Bento Supp. Defs.' Mot. Summ. J. ("Bento Decl.") ¶¶ 2-3, 5, ECF No. 15; Decl. Matthew Roach Supp. Defs.' Mot. Summ. J. ("Roach Decl.") ¶¶ 2-3, 11, ECF No. 16; Decl. Samuel Tharp Supp. Defs.' Mot. Summ. J. ("Tharp Decl.") ¶¶ 2-3, 8, ECF No. 17, demonstrating that in mid-August 2024, the CCSO deputies declared that they had been "employed by the CCSO" for "approximately five years" (Bento, Sanders, and Roach) or "approximately [five and a half] years" (Tharp)).

For example, Sanders, who had no previous law enforcement or military experience, started the sixteen-week basic police academy in January 2019, began working for CCSO in December 2019, spent his first seventeen weeks or so driving with an in-car coach, and "[f]rom that point on[, he was] a solo deputy." (Dep. Evan Sanders ("Sanders Dep.") 6:3-18, 16:1-10, June 11, 2024, ECF No. 26-2 at 1-48.). Tharp also had no previous law enforcement or military experience, and began working as a reserve deputy in 2017 before transitioning to a full-time patrol deputy in 2019. (Dep. Samuel Tharp ("Tharp Dep.") 7:14-8:1, June 10, 2024, ECF No. 26-3 at 1-58.)

Bento, on the other hand, started out as a CCSO cadet/trainee between 2012 and 2015, served three years in the U.S. Army, and began working for the CCSO in September 2019, at which point he attended the sixteen-week academy.[2] (Dep. Janson Bento ("Bento Dep.") 12:2-14:10, 15:7-13. 17:15-24, June 11, 2024, ECF No. 26-4 at 1-70.) Unlike the other CCSO deputies, Bento was involved in a previous lethal force incident before September 2021. (*Id.* 17:25-18.)

Sanders and Honeycutt crossed paths at around 2:00 a.m. on September 27, 2021, when Sanders was conducting a "routine patrol" in a marked vehicle. (Sanders Decl. ¶ 3; Sanders Dep. 17:7-18:2; Interview Deputy Evan Sanders ("Sanders Tr.") 1:1-19, Sept. 27, 2021, ECF No. 26-5.) During these patrols, Sanders "look[s] for people committing traffic violations, . . . people on their way to commit crimes . . . [or] in the process of committing crimes, [people] driving stolen vehicles, [and] people with warrants, drugs, [or] guns." (Sanders Dep. 17:15-22.) Sanders was approaching an intersection when he saw Honeycutt's older white Ford Ranger pickup driving ahead of him with its tailgate down. (*Id.* 17: 23-18:7; Sanders Tr. 1:16-18.) Sanders considered it "unusual" for a pickup to be driving with its tailgate down and his view was partially obstructed, but he believed that he could "see enough" to determine that there was "no [license] plates on [Honeycutt's] vehicle." (Sanders Dep. 18:3-7; Sanders Tr. 10:9-23.) Sanders also considered the time of night because of his training and experience working graveyard in Happy Valley, where there is "very low vehicle traffic that late at night" and thus "any vehicle out moving at that time catches [his] attention." (Sanders Dep. 29:23-32:23; *see also id.* 33:4-10, demonstrating that Sanders testified that at the time, there was "an epidemic of stolen vehicles" in the "Portland

---

[2] The Court only received excerpts of Roach's deposition testimony, which do not provide comparable descriptions of his experience. (*See* Dep. Matthew Roach ("Roach Dep.") 14:1-15:25, 19:1-21:25, 23:1-27:25, 57:1-59:25, 71:1-74:25, 76:1-25, June 10, 2024, ECF No. 18-5 at 1-18.)

metro area" and he already had "lots of experience stopping . . . or chasing [stolen] vehicles . . . [that] start[ed] with a vehicle that had no license plate").

After Honeycutt turned right at the intersection's stop sign, Sanders did the same and continued to follow behind Honeycutt's truck. (Sanders Dep. 18:8-12; Sanders Tr. 1:16-19.) Sanders observed Honeycutt "fail[] to drive within [his] lane several times . . . [by] starting to go over the center line . . . a half tire[] width before correcting" his position. (Sanders Tr. 1:19-23; Sanders Dep. 12:15-16.) Honeycutt's failure to maintain his lane seemed "odd" and "caught [Sanders'] attention" but before Sanders was able to "even think to do anything," Honeycutt "immediately pulled off [to] the [shoulder] of the road." (Sanders Tr. 1:23-24; Sanders Dep. 18:17-18; *see also* Sanders Dep. 30:17-19, reflecting that Sanders testified that "[a]lmost immediately" after he began to follow Honeycutt, he observed Honeycutt "fail[] to maintain [his] lane").

It was "too dark" for Sanders to see inside of Honeycutt's cab as he "slowly rolled past [Honeycutt's] Ford Ranger," so he continued up the hillside road and watched from his rearview mirror as Honeycutt "swung out" and into a driveway on the other side of the street, completed a three-point turn after another vehicle passed, and headed back to and turned right at the "same intersection." (Sanders Tr. 1:24-2:6, 12:2-13:11; Sanders Dep. 18:19-19:12.) Sanders "turned around and started trying to catch up to [Honeycutt's] vehicle." (Sanders Dep. 19:12-14; Sanders Tr. 2:6.)

After turning at the intersection, Sanders could see Honeycutt's pickup further down the road and "again . . . failing to maintain its lane" and "drifting over the centerline several times[.]" (Sanders Tr. 2:8-10; Sanders Dep. 19:15-22.) Sanders also "paced" Honeycutt's speed as "roughly [fifteen] miles per hour over the speed limit," which meant that Honeycutt was "going

[fifty] in a [thirty-five]" mile per hour zone. (Sanders Dep. 19:15-19; Sanders Tr. 2:10-11, 10:20-11:16.) At this point, Sanders decided to initiate a traffic stop because he believed that he had a "reasonable suspicion" that Honeycutt was driving under the influence and Honeycutt was speeding and driving without license plates. (Sanders Dep. 19:17-20:3; Sanders Tr. 2:15-17, 10:6-11:16.)

Sanders attempted to initiate the stop when he caught up to and followed Honeycutt through a turn at an intersection. (Sanders Tr. 2:11-14; Sanders Dep. 20:2-6; *see also* Decl. Scott Ciecko Supp. Defs.' Mot. Summ. J. ("Ciecko Decl.") Ciecko Decl. ¶ 2 & Ex. 101 (filed conventionally), ECF Nos. 18, 24, submitting Sanders' in-car video footage; Ciecko Decl. Ex. 102 at 1-43, ECF No. 18-1, attaching the computer-aided dispatch ("CAD") report). Sanders' in-car dashcam footage and the CAD report reflect that (1) at 1:57:20 a.m., Sanders' in-car footage begins with Honeycutt's pickup at the opposite end of a long straightaway, (2) at 1:57:43 a.m., Sanders closed the gap as Honeycutt turned at an intersection, (3) at 1:57:50 a.m., Sanders activated his overhead lights as he was completing the same turn, (4) at 1:57:52 to 1:57:54 a.m., Honeycutt swerved over a solid yellow line abutting a center turn lane, (5) at 1:57:55 a.m., dispatch received Sanders' initial call, and (6) at 1:58:02 a.m., Sanders activated his siren and Honeycutt rapidly accelerated away while crossing solid yellow center lines. (Ciecko Decl. Exs. 101 & 102 at 1.)

Given the recent change to CCSO's pursuit policy, Sanders immediately turned off his lights and siren and continued driving at a normal rate of speed when Honeycutt began to flee. (Sanders Dep. 10:5-18, 20:2-21:2; Sanders Tr. 2:11-3:1.) Sanders advised dispatch and any responding units that Honeycutt was "taking off" and he saw Honeycutt make a right-hand turn at the upcoming stop sign. (Sanders Dep. 20:24-21:11; Sanders Tr. 2:11-3:1; Ciecko Decl. Ex.

101, showing that at 1:58:23 to 1:58:26 a.m., Honeycutt's brake lights flashed in the distance as he made this turn). Sanders proceeded to make the same right-hand turn about twenty seconds later. (*See* Ciecko Decl. Ex. 101, reflecting that at 1:58:44 to 1:58:47 a.m., Sanders turned at the stop sign).

Sanders did not have a visual of Honeycutt's truck as he proceeded along a windy stretch of road. (Sanders Dep. 21:12-14; Ciecko Decl. Ex. 101, covering the relevant period at 1:58:48 to 1:59:09 a.m.). Near the end of a large curve in the road, however, Sanders spotted the taillights of Honeycutt's truck in the distance negotiating a roundabout. (Sanders Dep. 21:12-19; Sanders Tr. 3:2-5; Ciecko Decl. Ex. 101, depicting the first visual at 1:59:10 a.m.). Sanders, who was "personally . . . familiar with th[is] area," knew that Honeycutt was heading up Scouters Mountain Road, which was a "dead end" with only "one way in," "one way out," and a long stretch of cross streets into a neighborhood.[3] (Sanders Dep. 21:12-22:4; Sanders Tr. 3:5-11; *see also* Ciecko Decl. Ex. 101, showing the road and neighborhood cross streets at 1:59:33 to 1:59:58 a.m.).

Sanders advised responding units that he saw Honeycutt's vehicle traveling up Scouters Mountain Road and planned to stop at one of the neighborhood cross streets. (Sanders Tr. 3:7-10; Sanders Dep. 21:21-22:4.) Sanders set up spike strips (also known as "[s]top [s]ticks") and radioed Tharp, who was "pretty close behind" and the "first unit in the area," because he was "all set with spikes" and wanted Tharp to "head up to the dead end" to see if Honeycutt "ditched the vehicle or [could be] flush[ed] . . . back down the hill where [he was] prepared with spikes."

---

[3] The Oregon State Police ("OSP") and Oregon City Police Department interviewed Sanders about three hours after the Honeycutt incident, and Sanders mistakenly referred to Scouters Mountain Road as "Mount Scott." (Sanders Tr. 1:1-3, 3:2-19, 4:2-6; Lafky Decl. ¶ 8; *cf.* Sanders Dep. 8:26-9:19, 21:16-17, noting that Sanders reviewed his interview in June 2024 and said that this "incorrect" and "mistaken" street name was the only portion of the interview that he "screwed up").

(Sanders Tr. 3:10-18; Sanders Dep. 22:4-13.) Shortly after proceeding up the hill at "normal speeds" and without activating his overhead lights or siren, Tharp told Sanders that Honeycutt was "heading back down the hill toward[] [Sanders'] location."[4] (Sanders Tr. 3:18-23; Sanders Dep. 22:13-18.)

Although he was "hidden behind a [cross street] fence," Sanders could see Honeycutt's truck coming back down the hill toward the roundabout and executed a "successful [s]top [s]tick deployment on at least three of [Honeycutt's] four tires, [and] potentially all four."[5] (Sanders Tr. 3:24-4:2; Sanders Dep. 22:19-22.) Sanders informed the responding units that he successfully spiked Honeycutt's tires, and around the same time, Sanders heard Roach's and Bento's vehicles' "loud engines" approaching from a different direction and Roach broadcast that he was at the roundabout and "picked up . . . [as the] number [one.]" (Sanders Dep. 22:23-23:8; Sanders Tr. 4:3-7.) Tharp followed shortly thereafter, and Sanders collected his spike strips and attempted to catch up. (Sanders Dep. 23:7-19; Sanders Tr. 4:11-20; Ciecko Decl. Ex. 101, reflecting that at 2:02:52, 2:03:03, 2:03:06, and 2:03:49 a.m., respectively, Honeycutt ran over the spikes, Sanders collected the strips, Tharp followed without his overhead lights on, and Sanders headed in the same direction).

///

---

[4] At the time, Scouter Mountain road was marked as a thirty-five mile per hour zone and the "end of the road was not finished" because of ongoing home construction. (*See* Tharp Dep. 9:21-10:1 & Sanders Tr. 3:20-21, describing the construction and "road closed sign"; *see also* Ciecko Decl. Ex. 101, displaying the speed limit sign on the road after Sanders exits the roundabout).

[5] The CCSO purchases spike strips that use a "plastic triangle [with] little [internal] hollow spikes," which "puncture holes in the tire" but "do so in a way that's designed not to immediately pop the tire" and instead "start slowly letting air [out]" and allow the "person driving the suspect vehicle to maintain control" in a "safe manner[.]" (Sanders Dep. 37:10-38:24.)

Roach approached without his overhead lights on and watched to see if Honeycutt stopped or proceeded through the roundabout, which had a raised central island covered in foliage and signage. (Roach Dep. 14:13-21; *see also* Lafky Decl. ¶¶ 4-5 & Exs. 3-4 (filed conventionally), submitting Roach's front- and side-facing and Tharp's rear-facing in-car video footage; Ciecko Decl. ¶ 2 & Ex. 103 (filed conventionally), submitting the same Roach video).[6] Honeycutt entered the roundabout a few seconds later and took the first exit, which was on the opposite side of Roach's obstructed view. (*See* Lafky Decl. Ex. 3, showing that Roach approached around 2:03:06 a.m. and Honeycutt entered Roach's view and the roundabout at 2:03:08 and 2:03:10 a.m., and Roach followed and briefly lost sight of Honeycutt at 2:03:11 to 2:03:13 a.m.).

Roach initially followed at a distance as Honeycutt navigated multiple curves ahead and then ran a stop sign and sped down the oncoming lane and over two solid yellow center lines. (*See* Roach Dep. 14:22-15:4; Tharp Dep. 12:6-19, 15:1-10; Lafky Decl. Ex. 3, covering the period from 2:03:14 to 2:03:57 a.m.). At this point, Roach accelerated on a straightaway, activated his lights and sirens, and executed a "PIT" maneuver upon receiving his sergeant's permission to do so.[7] (Roach Dep. 15:5-8; Tharp Dep. 12:20-13:3; Lafky Decl. Ex. 3, reflecting

---

[6] Plaintiff's counsel identifies both of the videos that he submitted as Roach's in-car videos. (Lafky Decl. ¶¶ 4-5.) The record, however, suggests that the rear-facing video is from the inside of Tharp's vehicle, not Roach's vehicle. (*Compare id.* Ex. 3, showing that at 2:04:38 to 2:04:41 a.m., a second unit arrived and passed Roach's and Honeycutt's driver's side as Honeycutt exited and attempted to flee behind the second unit, *and id.* Ex. 4, reflecting that between the 1:08 to 1:10 marks in the rear-facing video, the second unit stops after passing the back-left side of Roach's vehicle and Honeycutt and Roach enter the picture, *and* Tharp Dep. 13:11-19, stating that Tharp "drove around to the left" of Honeycutt's and Roach's "location to finish [with his] vehicle to the front, [and] observed both . . . [Honeycutt] and Roach exit their vehicles rapidly").

[7] "To execute a pursuit intervention technique (PIT) maneuver, [police] officers deliberately collide their vehicle into the back half of either side of a target vehicle. By rotating the target without reversing its direction of travel, the aim of a PIT maneuver is to reverse the

that Roach contacted the back right side of Honeycutt's truck at 2:04:26 a.m.). Honeycutt drifted

and fish-tailed into a slide across the road, through a four-way stop, and against a curb. (Roach

Dep. 15:9-11; Tharp Dep. 13:4-10; Lafky Decl. Ex. 3, depicting the slide into the curb at 2:04:39

a.m.).

Tharp, who followed Roach's vehicle after Roach reported exiting the roundabout,

passed and stopped in front of Roach's driver's side as Roach "pinned the rear of [Honeycutt's

truck] against the sidewalk[.]" (Tharp Dep. 12:2-13:17; Lafky Decl. Ex. 3, showing that Tharp

arrived and passed Roach's and Honeycutt's driver's side between 2:04:38 to 2:04:41 a.m.;

Lafky Decl. Ex. 4, reflecting that between the 1:08 to 1:10 marks in the rear-facing video, Tharp

stops after passing the back-left side of Roach's vehicle before Honeycutt and Roach enter the

picture).

Roach immediately jumped out of his car when Honeycutt attempted to flee on foot and

yelled for Honeycutt to "get down on the ground" before lunging to grab onto Honeycutt's

shoulders.[8] (*See* Lafky Decl. Exs. 3-4, showing that Roach's and Tharp's in-car videos capture

---

target's drive train and cause its engine to stall." *Sabbe v. Wash. Cnty. Bd. of Comm'rs*, 84 F.4th 807, 812 n.1 (9th Cir. 2023) (citing *Longoria v. Pinal County*, 873 F.3d 699, 703 n.2 (9th Cir. 2017)).

[8] The Court notes that Tharp's rear-facing camera provides the clearest depiction of the Honeycutt incident, but many portions of the video remain unclear because of factors like the darkness of the night, dark colored clothing, number of people in close proximity, flashing lights, and shadows from a nearby fence, bushes, and overhanging tree. The audio from the in-car videos is also unclear at points because of factors like the proximity to the scene, motors, and loud in-car radios. The Court describes what it can see and hear before turning to the deputies' testimony, and does not attempt to describe audible but unclear portions of the Honeycutt incident.

The Court also notes that Tharp and Bento testified that they were wearing body microphones during the Honeycutt incident but "things [were] happening so fast" that they did not remember or believe that they had time to switch on their microphones, which were "not [in] the most straightforward" position "inside of a leather pouch" on their uniforms, "notorious for running out of battery . . . a few hours into [a] shift," and often kept off to preserve battery life.

the encounter and shooting at 2:04:39 to 2:05:04 a.m. and the 1:09 to 1:32 marks, respectively).
Roach's hands slid down to Honeycutt's chest and waist regions as he held onto and spun
Honeycutt to the ground. (*Id.*) Roach initially landed on his back and pulled Honeycutt onto his
midsection but used momentum to flip Honeycutt over his body and into a prone position. (*Id.*)
Tharp rushed in to help as Roach attempted to restrain Honeycutt and began delivering strikes
from his knees and Honeycutt's left side. (*Id.*) Bento pulled up and reached the group a few
seconds later. (*Id.*)

During the approximately twenty seconds between Roach grabbing and Bento fatally
shooting Honeycutt, Roach's and Tharp's in-car videos appear to capture Roach's initial
command to "get down on the ground" and a subsequent command to "stop." (*Id.*) Afterward,
the videos appear to capture the deputies struggle to restrain Honeycutt and the following audio
sequence: (1) "fucker," (2) "hey, listen, listen, listen," (3) "show me your hands," (4) "he's got a
gun," and (5) "drop the fucking gun," "okay," and three successive shots in the final four-second
period. (*Id.*)

When Tharp exited his vehicle, he heard Roach "shouting for . . . Honeycutt to stop" and
proceeded to "shout[] the same." (Tharp Dep. 13:16-23, 16:13-18.) Upon reaching Roach's and
Honeycutt's nearby grounded position, Tharp "straddled [Honeycutt's] legs[]" in an attempt to
"immobilize" and prevent Honeycutt from "get[ting] up and run[ning] away." (*Id.* 16:22-17:13.)
Tharp "could see [Roach] out of [his] peripheral . . . delivering focus blows to gain compliance
as [the deputies] were shouting to . . . Honeycutt to show [them] his hands" and "requesting
numerous times to see [Honeycutt's] hands[] [and] stop resisting." (*Id.* 17:8-13, 19:19-20:7; *see*

---

(Bento Dep. 24:4-25-9; Tharp Dep. 39:15-42:2, 54:16-55:16.) In 2022 or 2023, the CCSO began
using a new system with improved battery life and body cameras. (Tharp Dep. 41:11-21; Bento
Dep. 25:12-17.)

*also* Roach Dep. 15:2-21, 20:8-18 & Roach Decl. ¶¶ 10-11, stating that Roach delivered "[a]round five" strikes with his hands or right knee to and from the left "side of" Honeycutt, which "did not change . . . Honeycutt's behavior" or "appear to have any significant impact on him"). Tharp never saw Roach "at any point gain control of any part of . . . Honeycutt's body[.]" (*Id.* 19:15-18.)

Given that Honeycutt was "moving both hands underneath his body as he was on his stomach," Tharp grabbed onto Honeycutt's left arm and "used force to remove [Honeycutt's] left arm out from underneath his body and gain control of [it.]" (*Id.* at 17:14-22.) Tharp, however, could "feel [Honeycutt] giving force back" and that Honeycutt had not "stopped resisting at that point" and "continued to want to move his arms back to the underside of his body." (*Id.* 17:22-18:1.) Tharp recalled there was a large boulder to his right and, at one point, he "fe[lt] a roll" and "shift [in his] balance towards the right" as "Honeycutt roll[ed] from underneath [him]." (*Id.* 18:2-4.) Tharp recognized that he did not want to be "pinned in a precarious position" between a boulder and Honeycutt, and began looking toward the boulder as he attempted to reposition himself more to his left side. (*Id.* 18:8-13, 19:19-20:1, 20:22-21:8, 23:16-19, 24:20-25:6.) Tharp explained that "[i]n the midst of that movement," he heard Bento (or potentially Roach) repeat "gun" three times, "shout[s] to stop reaching for the gun," and "then . . . three shots ringing out" a "second or two [later]." (*Id.* 18:10-13, 24:20-25, 48:4-7.) Honeycutt's roll "stopped with the shots being fired" and Tharp could not recall "how much of the roll had happened." (*Id.* 47:10-48:3, 50:22-51:2.)

The only thing that Tharp recalled Honeycutt saying at any point during the incident was "something along the lines of 'shoot[,]'" but Tharp acknowledged that it was unclear if this was "projected toward[]" the deputies and he could not "hear that in the video when [he] review[ed]

it." (*Id.* 21:9-25, 48:8-49:1.) Tharp never heard Honeycutt say, "I have a gun," "I don't have it," "[l]isten," "[h]ey, listen," "[w]hat's your problem," "[g]et off me," or "words to that effect[.]" (*Id.*)

Roach recalled Honeycutt saying "I've got a gun" two times around "when [they] were falling to the ground" but Roach was "not 100 percent certain" on the timing. (Roach Dep. 15:15-18, 21:3-21.) When Honeycutt repeated that he had a gun, Roach "interpret[ed] that statement at that time" as Honeycutt "trying to intimidate or scare [Roach] . . . as though to get [Roach] to leave . . . [and] move away from him." (*Id.* 23:23-24:4.) Roach based this on the "scenario," "context," Honeycutt's "body language," and the "volume at which [Honeycutt] said it." (*Id.* 24:5-11.) Roached added that it was "never feasible for [him] to relay" Honeycutt's statement about having a gun to the other deputies (Tharp and Bento) who arrived on the scene. (*Id.* 23:17-22; *see also* Lafky Decl. Ex. 4, indicating that Roach landed on the ground and began flipping Honeycutt over and off him at the 1:12 mark and a deputy yells "he's got a gun" at the 1:25 mark; Bento Dep. 27:14-18, stating Bento saw and "announced that [Honeycutt had] a gun").

According to Roach, when he attempted to "talk to . . . or try to get [Honeycutt] to stop," Honeycutt was "anything but cooperative" and responded with "either verbal resistance or physical resistance." (Roach Dep. 71:18-25.) Roach, for example, recalled that in addition to Honeycutt's previous actions on the road, Honeycutt responded "no" when Roach instructed him to "get down," attempted to "get up after getting tackled," "me[t] [Roach] physically with resistance," "actively resist[ed]," "prevent[ed]" Roach from "securing" his hands and moving his "arms behind him," and "mov[ed] his hands and delv[ed] them into . . . baggy pockets[.]" (*Id.* 72:1-16.) Roach also explained that he "only could assume" that Honeycutt was "digging his

hands into his pockets" to "retrieve the weapon that he said he had on him," which caused Roach to be "concerned" that Honeycutt could "use the weapon against [him]self or the other deputies." (*Id.* 72:16-24.) Roach added that Honeycutt was "never cooperative," there was "never any compliance," Honeycutt "consistently tr[ied] to get away, . . . resist, [and] flee[]," and because of his safety concerns, he needed to use "physical force" against Honeycutt. (*Id.* 72:25-73:13, 73:21-74:7.)

Bento reached Roach, Tharp, and Honeycutt within about five seconds of Roach tackling Honeycutt. (*See* Lafky Decl. Ex. 4, showing that between the 1:12 to 1:18 marks, Honeycutt flips over a grounded Roach as Bento pulls up and that Tharp arrived a few seconds before Bento). Bento described seeing Roach delivering "focused blows" as he approached Honeycutt's right side and attempted to "reach under to get control of [Honeycutt's] right hand[.]" (Bento Dep. 27:1-15.)

Bento recalled that as he "overcame" Honeycutt's "tense" "arm muscles," "resistance," and "force" and pulled Honeycutt's right hand "out from underneath his body," he "s[aw] that there[] [was] a pistol in [Honeycutt's] hand" and Honeycutt's hand was "around the grip of the pistol . . . with the barrel pointed outward," which prompted him to "announce that [Honeycutt had] a gun, and [at] that [same] time . . . try[] to pull the gun out of . . . Honeycutt's hand." (*Id.* 27:16-20, 32:21-33:3, 33:18-34:14; *see also* Lafky Decl. Ex. 4, reflecting that at the 1:22 to 1:26 marks, Bento is bending over and reaching down before someone yells, "he's got a gun"). Bento also recalled that Honeycutt did not comply with his instruction to "drop the gun," he was unable to pull the gun away because Honeycutt had a "death grip on [it]," and Honeycutt was "able to roll onto his back to where . . . [the gun was] now pointed directly at [Bento's] kind of upper chest/torso area." (Bento Dep. 27:20-28:3, 35:17-22; *see also id.* 66:2-19, stating Honeycutt

failed to comply with Bento's command to "drop the fucking gun"). At the same time, Bento was "still maintaining control . . . or attempting to maintain control of [Honeycutt's right] hand," pushed "the gun out of the way so [it was] not pointed at [him]," "drew [his] duty pistol," "fired three rounds into . . . Honeycutt," and felt Honeycutt "go limp and the gun was no longer in his hands." (*Id.* 28:3-9; *see also id.* 37:14-40:25, indicating that Bento testified that he initially used both of his hands to pull out Honeycutt's right arm, voluntarily released and drew his duty pistol with his right arm, used only his "left hand" to "redirect" Honeycutt's gun, and maintained "at least[] contact" with but did not have "control of [Honeycutt's] whole [right] arm" or right "hand at the time").

Bento acknowledged that he cannot recall or remember if Honeycutt had "a finger [o]n the trigger or not" and Honeycutt did not have the gun pointed at him or the other deputies "in that [initial, pre-roll] moment" when he pulled Honeycutt's arm out. (*Id.* 34:8-35:5, 37:8-10.) In addition to his statements, Bento recalled that Tharp said "[s]how us your hands . . . one time" but did not recall Honeycutt or Roach "mak[ing] specific statements" during the encounter. (*Id.* 43:13-44:10.) Bento added that he "remember[ed] thinking [in] the moment that if [Honeycutt] pull[ed] [the] trigger right now[, he was] going to die" and thus it was "reasonable" to use his service weapon. (*Id.* 41:18-24; *see also id.* 53:2-23, 59:10-11, 61:12-18, confirming that Bento made the same statement to law enforcement officials who interviewed him a few days after the shooting).

Unlike Tharp and Bento, Sanders arrived on the scene shortly after the other deputies' physical encounter with Honeycutt. (*See* Lafky Decl. Ex. 4, depicting Sanders pulling around the corner at the 1:46 to 1:50 marks). Sanders helped move Honeycutt's body to the nearby sidewalk because it was "a big, flat open area for [the deputies] to be able to administer aid . . . [and] apply

chest seals." (Sanders Dep. 25:1-27:10.) After Bento retrieved and applied three chest seals from his medical kit, Sanders started and "continued chest compressions for almost the entire time leading up to medical personnel arriving on scene." (*Id.* 27:10-21; Bento Dep. 28:7-14; 49:4-20.) When fire personnel arrived, they "pronounce[d] . . . Honeycutt deceased." (Bento Dep. 28:13-14.)

Later that same morning, a deputy state medical examiner performed an autopsy. (*See* Ciecko Decl. ¶ 7 & Ex. 106 at 2, ECF No. 19, attaching a Forensic Examination Report on the autopsy that the medical examiner performed at 10:25 a.m. on September 27, 2021). The medical examiner's report reflects that Bento's shots entered Honeycutt's left and right "upper chest," and identifies Honeycutt as twenty-six years old, six feet, two inches tall, and 169 pounds. (*Id.* at 2-4.)

On January 18, 2022, a state forensic scientist issued an Analytical Report confirming that methamphetamine was present in Honeycutt's system. (*Id.* ¶ 8 & Ex. 107 at 1, ECF No. 19-1.)

## LEGAL STANDARDS

At summary judgment in deadly force cases, courts "view[] the facts in the light most favorable to the nonmovant, but are 'limited to considering what facts the officer[s] could have known at the time of the incident.'" *Sabbe*, 84 F.4th at 815-16 (quoting *Est. of Lopez ex rel. Lopex v. Gelhaus*, 871 F.3d 998, 1006 (9th Cir. 2017)). A court's "analysis proceeds from the perspective of a 'reasonable officer on the scene' and must 'allow for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation.'" *Id.* at 816 (quoting *Plumhoff v. Rickard*, 572 U.S. 765, 775 (2014)).

///

"Deadly force cases pose a particularly difficult problem [at summary judgment] because the officer defendant[s] [are] often the only surviving eyewitness." *Scott v. Henrich*, 39 F.3d 912, 915 (9th Cir. 1994). "When a victim dies in a police officer shooting, [courts must therefore] carefully examine 'all the evidence' . . . , including circumstantial evidence, to 'ensure that the officers are not taking advantage of the fact that the witness most likely to contradict [their] story—the person shot dead—is unable to testify.'" *Sabbe*, 84 F.4th at 816 (quoting *Gonzalez v. City of Anaheim*, 747 F.3d 789, 795 (9th Cir. 2014) (en banc)); *see also Lerette v. County of Hawaii*, No. 23-3175, 2024 WL 4658770, at *2 (9th Cir. Nov. 4, 2024) ("In an excessive force case where the only witness, other than the officers involved, is dead, '[courts must] carefully examine all the evidence . . . , such as medical reports, contemporaneous statements by the officer and the available physical evidence[.]'" (quoting *Gonzalez*, 747 F.3d at 795)).

The Ninth Circuit has described a court's obligation to carefully examine all the evidence in a deadly force case as "especially demanding." *Hyer v. City & Cnty. of Honolulu*, 118 F.4th 1044, 1061 (9th Cir. 2024) ("[W]here deadly force is used, [courts] 'must carefully examine all the evidence in the record . . . to determine whether the officer's story is internally consistent and consistent with other known facts.' . . . This examination is especially demanding where . . . the victim is dead and there are no other non-officer witnesses." (quoting *Gonzalez*, 747 F.3d at 795)). "Consequently, the principle that 'summary judgment should be granted sparingly in excessive force cases . . . applies with particular force.'" *Id.* (quoting *Gonzalez*, 747 F.3d at 795).

## DISCUSSION

Defendants argue that they are entitled to summary judgment on Plaintiff's Section 1983 claims for Fourth, Eighth, and Fourteenth Amendment violations and municipal liability, and state law claims for assault, battery, and negligence. (*See* Defs.' Mot. Summ. J. ("Defs.' Mot.")

at 1, 26, ECF No. 14; Defs.' Reply Supp. Mot. Summ. J. ("Defs.' Reply") at 15, ECF No. 29.)
The Court agrees.

## I.    EXCESSIVE FORCE CLAIMS

Plaintiff asserts Section 1983 claims against Bento, Sanders, Roach, and Tharp (together, the "CCSO deputies"). (Compl. at 10-15, ECF No. 1-1.). Plaintiff alleges that the CCSO deputies used excessive force in violation of Honeycutt's Fourth, Eighth, and Fourteenth Amendment rights when they attempted a traffic stop, deployed a spike strip, executed a PIT maneuver, and pursued, tackled, restrained, physically assaulted, shot, and killed Honeycutt.[9] (Compl. ¶¶ 13-19, 36, 38, 41, 43, 46, 48, 50, 52; *cf.* Pl.'s Resp. at 7-13, confirming Plaintiff's various theories of liability).

### A.    Applicable Law

"A police officer's use of excessive force on a person [is] a seizure subject to the [reasonableness requirement of the] Fourth Amendment." *Hyer*, 118 F.4th at 1060-61 (citing *Graham v. Connor*, 490 U.S. 386, 388 (1989)); *see also Williams v. City of Sparks*, 112 F.4th 635, 642 (9th Cir. 2024) (noting that "[a] police officer's application of deadly force to restrain a subject's movements 'is a seizure subject to the reasonableness requirement of the Fourth

---

[9] Plaintiff also alleges that the CCSO deputies violated the Fourth, Eighth, and Fourteenth Amendments by depriving Honeycutt of his liberty and rights to due process and be free from cruel and unusual punishment. (Compl. ¶¶ 38, 43, 48, 52.) Nevertheless, the parties appear to agree that in analyzing Plaintiff's claims against the CCSO deputies, the Court need only apply the excessive force framework described below. (*See* Pl.'s Resp. Defs.' Mot. Summ. ("Pl.'s Resp.") at 8-15, 18-21, ECF No. 25, applying the same framework and arguing only that the CCSO deputies' use of force violated Honeycutt's "Fourth Amendment rights"; Defs.' Mot. at 11-15, 18-21, analyzing the CCSO deputies' challenged actions under the same framework); *cf. Mehta v. City of Upland*, 748 F. App'x 739, 741-42 (9th Cir. 2018) (observing that the plaintiff alleged that the defendant police officer "violated the Fourth, Eighth, and Fourteenth Amendments by using excessive force" and that "[c]laims for excessive force are analyzed under the Fourth Amendment's prohibition against unreasonable seizures," and thus applying the same framework).

Amendment'" (quoting *Tennessee v. Garner*, 471 U.S. 1, 7 (1985))). In evaluating a "claim of excessive force, [courts] ask whether the officers' actions were objectively reasonable in light of the facts and circumstances confronting them." *Williamson*, 23 F.4th at 1151 (simplified) (quoting *Rice*, 989 F.3d at 1121); *see also Sabbe*, 84 F.4th at 821 (stating that *Graham* "provides the framework that governs this part of [the analysis]").

Courts engage in a three-part inquiry to "determine whether an officer's actions were objectively reasonable[.]" *Williamson*, 23 F.4th at 1151; *see also Ramsey v. Lake Havasu City*, No. 23-3244, 2025 WL 66048, at *1 (9th Cir. Jan. 10, 2023) (recognizing that this circuit "approach[es] an excessive force claim in three stages" (quoting *Thompson v. Rahr*, 885 F.3d 582, 586 (9th Cir. 2018))). First, courts consider "the severity of the intrusion on the individual's Fourth Amendment rights by evaluating the type and amount of force inflicted[.]" *Williamson*, 23 F.4th at 1151 (quoting *Rice*, 989 F.3d at 1121); *Thompson*, 885 F.3d at 586 (same). Second, courts consider "the government's interest in the use of force[.]" *Williamson*, 23 F.4th at 1151 (quoting *Rice*, 989 F.3d at 1121). Third, courts consider "the balance between the gravity of the intrusion on the individual and the government's need for that intrusion." *Id.* (quoting *Rice*, 989 F.3d at 1121). Ultimately, courts must "judge the reasonableness of a particular use of force 'from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight[,]'" *id.* (quoting *Rice*, 989 F.3d at 1121, which quoted *Graham*, 490 U.S. at 396), and keep in mind that "police officers 'are not required to use the least intrusive degree of force possible.'" *Id.* (quoting *Lowry v. City of San Diego*, 858 F.3d 1248, 1256 (9th Cir. 2017) (en banc)).

///

///

B.    **Analysis**

1.    **Bento's Use of Force**

Plaintiff alleges that Bento's use of deadly force was excessive, arguing that Honeycutt was not engaged in highly dangerous criminal activity and there was no immediate threat to anyone's safety because Bento controlled Honeycutt's arm during the encounter and had sufficient time to give a warning before shooting. (Pl.'s Resp. at 11-13.) Based on the totality of the circumstances, the Court finds that Bento's use of deadly force was objectively reasonable as a matter of law.[10]

a.    **Type and Amount of Force**

The Court must first consider the severity of the intrusion on Honeycutt's Fourth Amendments rights. *See Williamson*, 23 F.4th at 1151 (identifying this initial step in a court's inquiry). "To gauge the type and amount of force used, [courts] assess both 'the risk of harm and the actual harm experienced.'" *Sabbe*, 84 F.4th at 821 (quoting *Nelson v. City of Davis*, 685 F.3d 867, 879 (9th Cir. 2012)). In considering the "specific factual circumstances" and "classifying the force used," courts also assess the "nature and degree of physical contact[.]" *Williamson*, 23

---

[10] Plaintiff separately addresses his excessive force theories against Tharp, Roach, and Bento. (*See* Pl.'s Resp. at 7-13, focusing on how Tharp flushed Honeycutt down Scouter Mountain Road onto the spike strips and "jumped on" Honeycutt, Roach physically struck Honeycutt, and Bento shot and killed Honeycutt). Plaintiff does not argue or appear able to prove that Sanders used any excessive force against Honeycutt, nor does he present any argument or case law supporting that Sanders' "use of spike strips in an attempt to disable a fleeing suspect['s] vehicle possibly violate[d] the Fourth Amendment." (*See* Defs.' Mot. at 17, raising this issue; *cf.* Pl.'s Resp. at 7-13, omitting such arguments or authorities and failing to address this basis of Defendants' motion). During oral argument, Plaintiff's counsel also agreed that it may be appropriate for the Court to dismiss Plaintiff's excessive force claim against Sanders. Given this posture, the Court grants Defendants' motion for summary judgment on Plaintiff's excessive force claim against Sanders. *See Hart v. City of Redwood City*, 99 F.4th 543, 549 (9th Cir. 2024) (holding that the plaintiffs had "not shown," among other things, that the officer's "conduct was objectively unreasonable"); *United States v. Guzman-Padilla*, 573 F.3d 865, 889 (9th Cir. 2009) (finding that it was reasonable for officers to effect vehicle stops by deploying "apparent[ly] safe[]" tire deflation devices).

F.4th at 1151-52 (stating that these matters are "relevant to th[e] analysis" (first quoting *Lowry*, 858 F.3d at 1259; and then citing *Forrester v. City of San Diego*, 25 F.3d 804, 807 (9th Cir. 1994))).

"The intrusiveness of a seizure by means of deadly force is unmatched." *Napouk v. Las Vegas Metro. Police Dep't*, 123 F.4th 906, 915 (9th Cir. 2024) (quoting *Garner*, 471 U.S. at 9). Like its sister circuits, the Ninth Circuit has "defined 'deadly force' as any force that '*creates a substantial risk* of causing death or serious bodily injury." *Sabbe*, 84 F.4th at 821 (quoting *Smith v. City of Hemet*, 394 F.3d 689, 706 (9th Cir. 2005) (en banc)). Deadly force is considered "the most severe intrusion on Fourth Amendment interests because a person has a 'fundamental interest in his own life.'" *Id.* (quoting *Garner*, 471 U.S. at 9). When an officer uses deadly force, a court's "inquiry reduces to 'whether the governmental interests at stake were sufficient to justify it.'" *Hart*, 99 F.4th at 549 (quoting *Vos v. City of Newport Beach*, 892 F.3d 1024, 1031 (9th Cir. 2018)).

The nature of Bento's intrusion is a "serious one" and "unmatched." *Id.* (addressing an officer's use of deadly force and stating that the "nature of the intrusion" was a "serious one" and "unmatched" (quoting *Garner*, 471 U.S. at 9)). Considering that this was a "clear intrusion" of Honeycutt's Fourth Amendment rights, the Court's "inquiry reduces to "whether the governmental interests at stake were sufficient to justify it.'" *Id.* (quoting *Vos*, 892 F.3d at 1031).

### b.   Government's Interest

"The Supreme Court's decision in *Graham* identified several factors to consider when evaluating the strength of the government's interest in the force used[.]" *Williams*, 112 F.4th at 643; *see also Hart*, 99 F.4th at 549 (turning to the *Graham* factors). The *Graham* factors are: "(1) 'the severity of the crime at issue,' (2) 'whether the suspect poses an immediate threat to the safety of the officers or others,' and (3) 'whether [the suspect] is actively resisting arrest or

PAGE 21 – OPINION AND ORDER

attempting to evade arrest by flight.'" *Williams*, 112 F.4th at 643 (quoting *Graham*, 490 U.S. at 396).

"The most important *Graham* factor is whether the suspect posed an immediate threat to anyone's safety[,]" *id.* (quoting *Nehad v. Browder*, 929 F.3d 1125, 1132 (9th Cir. 2019)), but the *Graham* "factors are not exclusive." *Id.* (citing *Bryan v. MacPherson*, 630 F.3d 805, 826 (9th Cir. 2010)). Courts "still must 'examine the totality of the circumstances and consider whatever specific factors may be appropriate in a particular case, whether or not listed in *Graham*.'" *Id.* (quoting *Bryan*, 630 F.3d at 826). Such "factors may include the availability of less intrusive force, whether proper warnings were given, and whether it should have been apparent to the officer that the subject of the force used was mentally disturbed." *Id.* (quoting *Est. of Lopez*, 871 F.3d at 1006).

The Court begins by addressing the most important *Graham* factor—namely, whether Honeycutt posed an immediate threat to Bento's safety. *See Hart*, 99 F.4th at 549 (beginning with the "most important factor" of whether the decedent "posed an immediate threat to [the] [o]fficer" who used deadly force) (simplified); *Napouk*, 123 F.4th at 915 (same). As discussed above, "[t]he reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Hart*, 99 F.4th at 549 (quoting *Graham*, 490 U.S. at 396). Consequently, the Court must consider the perspective of an officer on the scene in evaluating whether Honeycutt posed an immediate threat to Bento. *See id.* ("So when determining whether [the decedent] posed an immediate threat to [the] [o]fficer [who used deadly force], the perspective of an officer *on the scene* must be considered").

///

It was objectively reasonable for Bento to believe that Honeycutt posed an immediate threat to his safety. *See generally Eyre v. City of Fairbanks*, No. 23-35206, 2024 WL 3688540, at *1 (9th Cir. Aug. 7, 2024) (recognizing that "[w]hen an individual points his gun in the officers' direction, the Constitution undoubtedly entitles the officer to respond with deadly force" (quoting *George v. Morris*, 736 F.3d 829, 838 (9th Cir. 2013))). The Ninth Circuit's recent opinion in *Estate of Strickland v. Nevada County*, 69 F.4th 614 (9th Cir. 2023), *cert. denied*, 144 S. Ct. 559 (2024), provides useful guidance here.

In *Strickland*, the Ninth Circuit "examine[d] whether it was objectively reasonable for officers to believe a black *toy* airsoft rifle pointed *in their direction* presented an immediate threat justifying the use of deadly force," and "based on the facts [presented], . . . sa[id] yes." *Id.* (emphasis added). The Ninth Circuit observed at the outset that (1) the decedent was "known to officers as homeless and mentally ill" and "obvious[ly] . . . suffering from a mental health crisis," (2) the "officers were responding to reports of a man walking in the neighborhood with a shotgun, [but the decedent] was not under suspicion for committing a serious or dangerous crime," (3) "[a]t the start of the confrontation with police, [the decedent] had not yet brandished the gun at anyone or threatened the life or property of others," and (4) the officers "failed to employ de-escalation techniques" and "seemingly exacerbated the situation by aggressively shouting directions at [the decedent] upon their arrival." *Id.* at 619-20. Although these facts supported that the "bulk of the *Graham* factors favor[ed]" the decedent, the Ninth Circuit held that the "immediacy of the threat that [the decedent] posed outweigh[ed] those considerations." *Id.* at 620.

In so holding, the Ninth Circuit recognized that a court's objective reasonableness inquiry is a "fact-bound question," not a "static" analysis subject to "per se rules," and may "change as

circumstances evolve." *Id.* (first citing *George*, 736 F.3d at 838; and then quoting *Hyde*, 23 F.4th at 870). The Ninth Circuit, however, also recognized that its "prior decisions offer[ed] some guidance in evaluating the reasonableness of lethal force in response to a threat." *Id.* Addressing the relevant "end of the [circuit precedent] spectrum," the Ninth Circuit explained that "[w]hen a suspect points a gun in an officer's direction, 'the Constitution undoubtedly entitles the officer to respond with deadly force.'" *Id.* (quoting *George*, 736 F.3d at 838). The Ninth Circuit added that "[r]easonableness also doesn't 'always require[] officers to delay their fire until a suspect turns his weapon on them.'" *Id.* (quoting *George*, 736 F.3d at 838). After all, "[o]fficers shouldn't have to 'wait until a gun is pointed at them before they are entitled to take action.'" *Id.* (brackets omitted) (quoting *Anderson v. Russell*, 247 F.3d 125, 131 (4th Cir. 2001)). Accordingly, "[i]f the person is armed—or reasonably suspected of being armed—a furtive movement, harrowing gesture, or serious verbal threat might create an immediate threat." *Id.* (quoting *George*, 736 F.3d at 838).

In *Strickland*, after observing that these principles apply even if an officer is reasonably mistaken about the threat (e.g., a suspect was likely to fight back or possesses a real firearm), the Ninth Circuit turned to the facts and focused its analysis on how the officers met a "tense, uncertain, and rapidly evolving" circumstance when they confronted the decedent and an officer's "misplaced trust in this circumstance could be fatal":

> These principles apply even when officers are reasonably mistaken about the nature of the threat. "Officers can have reasonable, but mistaken, beliefs as to the facts establishing the existence of" an immediate threat, and "in those situations courts will not hold that they have violated the Constitution." *Saucier v. Katz*, 533 U.S. 194, 206 (2001). Take the example given by the [Supreme] Court: "If an officer reasonably, but mistakenly, believed that a suspect was likely to fight back, . . . the officer would be justified in using more force than in fact was needed." *Id.* at 205. Thus, the Constitution even allows for [an] officer's action that resulted from a reasonable "mistake of fact." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). When an officer's "use of force is based on a mistake of fact,

[this circuit] ask[s] whether a reasonable officer would have or should have accurately perceived that fact." *Torres v. City of Madera*, 648 F.3d 1119, 1124 (9th Cir. 2011)).

. . . .

As is often the case with officer-involved shootings, officers met a "tense, uncertain, and rapidly evolving" circumstance when they confronted Strickland. *Graham*, 490 U.S. at 397. They found him on a residential street carrying what appeared to be a firearm. The officers remembered Strickland from his prior detentions, and they knew he suffered from mental health issues. Compounding the situation, . . . his mental challenges were so severe that he was "not likely to respond to directions in a normal or expected manner." After surrounding him, the officers immediately ordered him to put down the gun. The officers cautioned Strickland that they did "not want to kill [him]" and repeatedly yelled at him to "drop the gun." Strickland did not comply. Instead, while pointing the replica gun's barrel at the ground, he explained, "I'm not doing nothing wrong."

After continued warnings, three officers approached Strickland with their firearms drawn. Strickland dropped to his knees, continuing to hold the gun. Strickland then began pointing the replica gun in the direction of the approaching officers. One officer tried tasing Strickland but failed to disable him. A few second later, the three officers fired on Strickland, striking him several times and killing him. The whole encounter from start to finish lasted a little more than three minutes.

The pivotal moment occurred when Strickland began pointing the replica gun in the officers' direction. At that point, they had "probable cause to believe that [Strickland] pose[d] a significant threat of death or serious physical injury" to themselves and it became objectively reasonable for them to use lethal force. *Garner*, 471 U.S. at 3. As [this circuit has] said, when a suspect points a gun in the direction of officers, they would be justified to use deadly force. *See George*, 736 F.3d at 838.

This analysis doesn't change because the weapon turned out to be a replica given the officers' reasonable belief that Strickland possessed a real firearm. They were called to the scene based on reports of a man walking down a residential street with what appeared to be a shotgun. When officers arrived, they saw Strickland armed with the black replica gun—as with all replicas, it was presumably intended to look like a real firearm. . . . [F]rom its appearance, the only indication that the replica was not real was its orange-painted tip. Although Strickland tried to convince officers that the object was "a BB gun," even slapping it to make a plastic sound, officers disbelieved him. They responded, "we don't know that's a fake gun" and suggested that Strickland "could have painted" the orange tip. The officers were reasonably justified in not taking Strickland's assurances at face value. *Cf. Blanford v. Sacramento County*, 406 F.3d 1110, 1116 (9th Cir. 2005) (finding it objectively reasonable for officers to

attempt to "secure the weapon first" when confronting a suspect who might be "mentally disturbed or under the influence of a controlled substance"). After all, misplaced trust in this circumstance could be fatal for the officers.

. . . .

Here, under the totality of the circumstances, it was objectively reasonable for the officers to believe Strickland posed an immediate threat. In the light most favorable to Strickland, he was carrying a replica gun, disregarded multiple warnings to drop it, and pointed it at the officers. Cf. *County of Los Angeles v. Mendez*, 581 U.S. 420, 425-26 (2017) (observing that the Ninth Circuit held that a shooting of a person with a BB gun was reasonable given the officers' belief that the individual had a gun and was threatening them while reversing on other grounds). While the misidentification of the replica gun adds to the tragedy of this situation, it does not render the officers' use of force objectively unreasonable.

. . . [Strickland's] [e]state pleads that Strickland was carrying a toy gun that resembled a real firearm, that he ignored multiple commands to drop it, and that he pointed it at the officers during a tense confrontation. When he did so, the officers were left with only an instant to act. They were not required to "delay their fire" until they learned whether the gun was real. *George*, 736 F.3d at 838. Given the immediacy of the threat presented by these allegations, the [e]state cannot state a plausible claim for excessive force, regardless of whatever additional facts Strickland might allege.

*Id.* at 621-23.

This case and *Strickland* are comparable in several noteworthy respects. First, like *Strickland* and many officer-involved shooting cases, Bento faced a "tense, uncertain, and rapidly evolving" circumstance when he confronted Honeycutt. *See Graham*, 490 U.S. at 397. Bento arrived as Roach took a fleeing Honeycutt to the ground and Tharp rushed over to assist. (Bento Dep. 27:1-10, noting that Bento initially attempted to report "fighting" over the radio; Bento Decl. ¶ 3, describing Bento's arrival and belief that "Honeycutt was actively fighting with deputies").

At that point, Bento's understanding was that Honeycutt engaged in reckless driving and endangerment and eluded and resisted arrest. (Bento Dep. 57:25-58:7, 59:18-60:23.) Bento reached Roach, Tharp, and Honeycutt within about five seconds of Roach tackling Honeycutt.

(*See* Lafky Decl. Ex. 4, showing that between the 1:12 to 1:18 marks, Honeycutt flipped over a grounded Roach as Bento pulls up and that Tharp approached Roach and Honeycutt a few seconds beforehand). Bento attempted to "reach under to get control of [Honeycutt's] right hand" and recalled that as he "overcame" Honeycutt's "tense" "arm muscles," "resistance," and "force" and pulled Honeycutt's right hand "out from underneath his body," he "s[aw] that there[] [was] a pistol in [Honeycutt's] hand" and Honeycutt's hand was "around the grip of the pistol . . . with the barrel pointed outward," which prompted him to "announce that [Honeycutt had] a gun, and [at] that [same] time . . . try[] to pull the gun out of . . . Honeycutt's hand." (*Id.* 27:1-20, 32:21-33:3, 33:18-34:14; *see also* Lafky Decl. Ex. 4, reflecting that at the 1:22 to 1:26 marks, Bento is bending and reaching down toward and close to Honeycutt before Bento yelled, "he's got a gun").

Importantly, and similar to but far more significant than the situation in *Strickland*, it is undisputed that Honeycutt was not only holding onto a real gun, he was also physically engaged with the deputies and resisting arrest. (*See* Pl.'s Resp. at 12, conceding that a fact favorable to Bento is that "Honeycutt was resisting"; *id.* at 13, arguing that Bento had "control over [Honeycutt's] hand with the gun in it" and citing the 1:26 to 1:32 marks when Bento yelled "drop the fucking gun" before firing his gun; *id.* at 4-5, arguing that the record reflects that Bento was "able to push the gun away from him[self]" before "yell[ing] out" that Honeycutt's "got a gun" and fatally shooting Honeycutt). Similar to *Strickland*, the video also confirms Bento's testimony that before resorting to lethal force, he ordered Honeycutt to "drop the fucking gun." (*See* Lafky Ex. 4, reflecting that at the 1:18 and 1:25 marks, Bento reaches the group's grounded position and yelled that Honeycutt had a gun, and at the 1:28 to 1:32 marks, the video captures a four-second sequence of Bento yelling "drop the fucking gun," what sounds like "okay," and

three successive gun shots; *cf.* Bento Dep. 27:14-18, 66:2-19, recounting that Bento made both statements).

Plaintiff fails adequately to address these facts. Nor does he argue that during this tense, rapidly evolving, and extremely short physical encounter (i.e., approximately twenty seconds compared to a little more than three minutes in *Strickland*), Honeycutt ever released his weapon as he actively resisted arrest and remained in close proximity to Bento and the other deputies. Instead, Plaintiff claims that Bento said that Honeycutt "had a gun" at the 1:29 mark, that Honeycutt "pleaded for his life" and stated, "don't shoot okay," that Bento failed to "issue a warning," and that "[t]wo seconds [was] plenty of time to issue a warning that deadly force was going to be used." (Pl.'s Resp. at 12, first citing Lafky Decl. Ex. 4; and then citing *Gonzalez*, 747 F.3d at 794.)

The video footage appears to capture someone (presumably, Honeycutt) say "okay" one second before the first of three successive shots. The Court listened numerous times to the clip that Plaintiff cites, at maximum volume on several media players and devices. The Court was unable to hear the words "don't shoot" or what it could fairly describe as Honeycutt "plead[ing] for his life," and Plaintiff offers no other (and the Court located no other) supporting evidence. However, even if the Court credits Plaintiff's version of events, the video clearly captures Bento ordering Honeycutt, a suspect who was admittedly resisting arrest and holding a gun, to "drop the fucking gun." *Cf. Strickland*, 69 F.4th at 621 (noting that the officers, who were not engaged with a suspect resisting arrest, "repeatedly yelled . . . to 'drop the gun'" before using deadly force); *Sabbe*, 84 F.4th at 816 (noting that this circuit "do[es] not credit a party's version of events . . . [if] an unchallenged video recording of the incident[] quite clearly contradicts [it]" (quoting *Williamson*, 23 F.4th at 1149 n.1)). Plaintiff does not argue or present evidence that

Honeycutt dropped the gun. (*Cf.* Compl. ¶¶ 17-18, alleging that Bento "shouted . . . to drop the gun" and that Honeycutt was "unable to comply" in part because Bento had "control over [his] right arm").

In *Strickland*, the "pivotal moment" occurred when the decedent "began pointing the . . . gun in the officers' direction," because "[a]t that point, the[] [officers] had 'probable cause to believe that [decedent] pose[d] a significant threat of death or serious physical injury' to themselves and it became objectively reasonable for them to use lethal force." 69 F.4th at 618-19, 622-23 (quoting *Garner*, 471 U.S. at 3). By comparison, and despite acknowledging that Bento testified that "he saw [Honeycutt's] gun pointed at him," Plaintiff argues that Bento also testified that "he had control of [Honeycutt's right] arm the entire time," that "[b]eing in control of the arm with the gun should not give rise to immediate danger," and that the gunshot entry wounds to Honeycutt's left and upper right chest are "not dispositive that . . . [he] turned on his back." (Pl.'s Resp. at 11-12; *but cf.* Bento Dep. 28:3-9, noting that Bento was "still maintaining control . . . or attempting to maintain control of [Honeycutt's] hand," pushed "the gun out of the way so [it was] not pointed at [him]," "drew [his] duty pistol," and "fired three rounds"; Bento Dep 37:14-40:25, recounting that Bento initially used both hands to pull out Honeycutt's arm, voluntarily released and drew his duty pistol with his right arm, used his "left hand" to "redirect" Honeycutt's gun, and maintained "at least[] contact" with but did not have "control of [Honeycutt's] whole arm" or "hand at the time"; *see also* Ciecko Decl. Ex. 106 at 2, describing entrance wounds to the left and right "upper chest"; Bento Decl. ¶ 4, stating that post-roll and pre-shot, Honeycutt's "gun ended up pointing directly at [Bento's] chest from only six to seven inches away").

///

Even if the Court accepts Plaintiff's arguments at face value, at most Bento controlled Honeycutt's arm but not necessarily wrist mobility as he leaned toward and stood over and aligned with both sides of Honeycutt's chest. Plaintiff's version of events does not refute that Honeycutt's gun remained pointed in the direction of Bento, who had an instant to act and no margin for error. Plaintiff speculates that it is "more likely" that Bento "pulled" and "forced" Honeycutt's "torso off the ground before shooting [him]" (Pl.'s Resp. at 12), but the primary clip upon which Plaintiff relies (i.e., Tharp's video at the 1:13 to 1:36 marks) reveals no pre-shot pulling or forceful movement from Bento. (*See id.* at 5-6, 11-12, citing Lafky Ex. 4.) It also appears to show that Tharp's center of gravity shifted multiple times while he straddled Honeycutt's legs.

Considering the "totality of the circumstances," the Court concludes that it was objectively reasonable for Bento to believe that Honeycutt posed an immediate threat to his safety. *See Strickland*, 69 F.4th at 622-23 (same). Even when viewing the evidence in the light most favorable to Honeycutt and crediting Plaintiff's arguments, Honeycutt resisted arrest during a tense, rapidly evolving physical encounter with the deputies, did not comply with Bento's order to drop his gun, and held his gun in Bento's direction. As a result, Bento was "left with only an instant to act" and no margin for error and was not required to further "delay [his] fire." *Id.* (quoting *George*, 736 F.3d at 838).

Although the immediacy of the threat that Honeycutt posed to Bento (and others) is dispositive here, the Court concludes that other *Graham* factors and relevant considerations further support the reasonableness of Bento's conduct. *See Hart*, 99 F.4th at 552 (noting that "[e]ven though the immediacy of the threat posed by [the suspect] as he approached with a knife [was] dispositive, . . . other *Graham* factors also arguably support[ed] the reasonableness of [the

officer's] conduct, and certainly [did] not undermine it"). The third *Graham* factor, for example, is "whether [the suspect] is actively resisting arrest or attempting to evade arrest by flight." *Williams*, 112 F.4th at 643 (quoting *Graham*, 490 U.S. at 396). As the Court explained above, Plaintiff concedes that the third *Graham* factor favors Bento. (*See* Pl.'s Resp. at 12, conceding that this *Graham* "prong . . . weigh[s] in Bento's favor" because "Honeycutt was resisting arrest).

An additional factor supporting the Court's conclusion is that Bento considered other available tactics like his taser. *Cf. Rice*, 989 F.3d at 1123 (finding that a consideration supporting the opposite conclusion regarding the state's interest was that "the officers did not apparently consider what other tactics if any were available to effect the arrest") (simplified). Bento confirmed that he decided not to use his taser and explained why. (*See* Bento Dep. 51:9-52:24, reflecting that during his deposition, Bento confirmed that he "decided not to deploy" the taser for several reasons, including his training on a taser's "high probability of failure" and inability to "work well in very close proximity" because there must be an adequate "spread for the probes to be able to effectively incapacitate a subject" and the deputies "were so close to . . . Honeycutt and wrestling," all of which led him to conclude that his taser "just wouldn't have been effective").

Furthermore, the record does not support that Bento's firing of three successive shots was excessive given the situation he encountered. "It stands to reason that, if police officers are justified in firing at a suspect in order to end a severe threat to public safety, the officers need not stop shooting until the threat has ended." *Williams*, 112 F.4th at 645 (quoting *Plumhoff*, 572 U.S. at 777). Put another way, "if lethal force is justified, officers are taught to keep shooting until the threat is over." *Id.* (quoting *Plumhoff*, 572 U.S. at 777). Bento fired three successive shots in two

to three seconds, at which point Honeycutt dropped his gun. (Lafky Decl. Ex. 4; Bento Dep. 28:7-9, 44:11-45:1.) Bento reasonably fired three shots to ensure neutralization of a threat in his immediate vicinity. *Cf. Williams*, 112 F.4th at 645 ("During the fourteen seconds when the shots were fired, [the suspect] did not abandon his attempt to flee. . . . Having fired that initial volley, the officers then reasonably ceased firing[] [when the suspect's] further attempts at acceleration proved fruitless").

In summary, the Court concludes that the *Graham* factors weigh in Bento's favor. *Cf. Strickland*, 69 F.4th at 619-23 (determining that the "bulk of the *Graham* factors favor[ed]" the decedent but were nevertheless "outweigh[ed]" by "the immediacy of the threat that [he] posed").

### c.    Balance of Interests

The Court's third and final consideration is "the balance between the gravity of the intrusion on the individual and the government's need for that intrusion." *Williamson*, 23 F.4th at 1151.

Based on the totality of the circumstances, the Court concludes that no reasonable jury could find that Bento's use of deadly force against Honeycutt outweighed Bento's need to use such force. *See Strickland*, 69 F.4th at 622-23 ("[U]nder the totality of the circumstances, it was objectively reasonable for the officers to believe [the decedent] posed an immediate threat. In the light most favorable to [the decedent], he was carrying a replica gun, disregarded multiple warnings to drop it, and pointed it at the officers."); *cf. Rice*, 989 F.3d at 1124 ("In light of all the circumstances, a reasonable jury could conclude that [the police officers'] use of substantial force against [the suspect] outweighed the officers' need for its use." (citing *Lowry*, 858 F.3d at 1256)). Accordingly, with respect to Plaintiff's excessive force claim based on Bento's use of deadly force, the Court concludes that Bento's actions were objectively reasonable and enters

summary judgment on Plaintiff's excessive force claim against Bento. *See Williams*, 112 F.4th at 644, 646 (finding that there was "no constitutional violation in the officers' use of force").

### 2.    Tharp's Use of Force

Applying "*Graham*'s three-step balancing framework," *Rice*, 989 F.3d at 1124, the Court also concludes that Tharp's actions were objectively reasonable.

### a.    Type and Amount of Force Used

Plaintiff argues that Tharp used excessive force when he "jump[ed] on top of [Honeycutt] prone on the ground and stay[ed] on top of him" and "[f]lush[ed him] out and chas[ed him] down a mountain at high speeds." (Pl.'s Resp. at 8-9.) The Court finds that Tharp's intrusion and use of force was minimal, and the inherent risk of Tharp's actions was not significant.

In *Williamson*, the Ninth Circuit held that "even viewing the evidence in [the plaintiff's] favor, the type and amount of force used by the [o]fficers . . . was minimal." 23 F.4th at 1152. In support, the Ninth Circuit emphasized that the officers "did not strike" the plaintiff, "throw [the plaintiff] to the ground," or "use any compliance techniques or weapons for the purpose of inflicting pain"; rather, the officers simply "held [the plaintiff] by her arms and lifted her so they could pull her out of the meeting room after she went limp and refused to leave on her own or cooperate in being removed." *Id.* The Ninth Circuit added that the "inherent risk" of the officers' actions was "minimal," that it had previously found only a "minimal intrusion" in a case where officers were "'yanking, pulling, jerking, and twisting' a person whose legs [we]re pinned underneath a car seat," and that the plaintiff's "injuries—a sprained wrist, mild swelling, and a torn rotator cuff—[were] not trivial" but were "roughly equivalent" to and "much less severe" than past cases in which it "concluded that the intrusion at issue was minimal despite the injuries that occurred." *Id.* (first quoting *Johnson v. County of Los Angeles*, 340 F.3d 787, 792-93 (9th Cir. 2003); then citing *Forrester*, 25 F.3d at 807; and then citing *Johnson*, 340 F.3d at 788).

Contrary to Plaintiff's claim that Tharp "jumped on top" of a grounded Honeycutt "at the waist," Tharp's in-car video demonstrates that he lowered himself onto Honeycutt's lower half in a controlled manner. (*See* Lafky Decl. Ex. 4, depicting the relevant period at the 1:12 to 1:32 marks). Tharp then pulled, yanked, and held onto Honeycutt's arm, continued to straddle Honeycutt's legs, and attempted to maintain his balance while Honeycutt was resisting arrest. (*Id.*; *see also* Tharp Decl. ¶¶ 5-6, stating Tharp pulled Honeycutt's arm out from under his body because he was "continuing to force his hands downward and under his body toward[] his midsection" and his legs were "flailing and moving in a manner indicating he was trying to fight or get up"). The video and case law support that Tharp's intrusion and force was minimal and the inherent risk of Tharp's actions was "not significant." *See Williamson*, 23 F.4th at 1152. Plaintiff presents only a speculative, unsupported argument about the risk of Tharp injuring Honeycutt. (*See* Pl.'s Resp. at 8, arguing that there was a "risk" that Honeycutt "could sustain significant injuries from being jumped on by a fully grown man" while lying "prone" on the ground).

Plaintiff's argument about Tharp "[f]lushing [Honeycutt] out and chasing [him] down a mountain at high speeds" fares no better.[11] (Pl.'s Resp. at 7.) Even when viewed in Honeycutt's

---

[11] Before addressing an officer's use of force, courts "must first decide whether [the plaintiff] was seized within the meaning of the Fourth Amendment." *Sanderlin v. Dwyer*, 116 F.4th 905, 911 (9th Cir. 2024) (citation omitted). "A seizure 'can take the form of physical force or a show of authority that in some way restrain[s] the liberty of the person.'" *Sanderlin*, 116 F.4th at 911 (quoting *Torres v. Madrid*, 592 U.S. 306, 324 (2021)). When Tharp approached Scouter Mountain Road's dead end and observed Honeycutt "coming toward[]" him, Tharp did not believe that Honeycutt was "coming at [him]" but Honeycutt's truck did "jostle back and forth" and "kind of . . . jockey[] position" before Tharp moved toward his lane's shoulder "to give [Honeycutt] some room" and ensure that he did "get not into a collision with [Honeycutt, who] continued past [him]." (Tharp Dep. 11:3-10, 44:11-24.) Without actual submission, Tharp's "show of authority" was not a seizure within the scope of the Fourth Amendment. *See Cuevas v. City of Tulare*, 107 F.4th 894, 896 (9th Cir. 2024) (addressing the "type of stop" where an officer's "show of authority" restrains a person's liberty and explaining that there is "no seizure without actual submissions" because "[a]ttempted seizures are beyond the scope of the Fourth Amendment" and "[w]ithout actual force, an officer's pursuit of a fleeing felon or

favor, Honeycutt fled an initial traffic stop and proceeded up the dead-end "Scouter Mountain" road, which was under construction and a thirty-five mile per hour zone. (Sanders Dep. 21:12-19; Sanders Tr. 3:2-21; Ciecko Decl. Ex. 101; Tharp Dep. 9:21-10:1.) Sanders set up spike strips designed for safety [12] and asked Tharp to determine if Honeycutt "ditched the vehicle or [could be] flush[ed] . . . back down the hill where [he was] prepared with spikes." (Sanders Tr. 3:10-21; Sanders Dep. 9:21-10:1, 22:4-13.) Proceeding up the hill at "normal speeds" and without his overhead lights or siren on, Tharp radioed Sanders that Honeycutt was heading back down the hill toward Sanders' location." (Sanders Tr. 3:18-23; Sanders Dep. 22:13-18.) Tharp was more than ten seconds behind Honeycutt's vehicle when he drove back down because when he approached the dead end, Honeycutt had already turned around and was "actually coming toward[]" Tharp to go back down the road. (Tharp Dep. 10:12-11:4; Ciecko Decl. Ex. 101.)

In these moments, Tharp's intrusion was minimal and the inherent risk of Tharp's actions was not significant. The Court "conclude[s] that the totality of circumstances in this case establishes that the type and amount of force that [Tharp] used was minimal." *Williamson*, 23 F.4th at 1153.

///

///

///

---

misdemeanant, though a 'show of authority,' is not a seizure if the person does not 'comply with' commands to halt") (simplified). But even if there was a seizure, Tharp is entitled to summary judgment for the reasons explained herein. *See Hill v. City of Fountain Valley*, 70 F.4th 507, 616 (9th Cir. 2023) (assuming that there was a seizure and finding that the officers were entitled to qualified immunity).

[12] Consistent with the spike strip's design, Honeycutt did not lose control of his vehicle and in fact continued to drive at high speeds and well past where Sanders deployed the spike strips.

b.    **Government's Interest**

The Court "now weigh[s]" Tharp's "minimal use of force against the government's interests." *Bernal v. Sacramento Cnty. Sheriff's Dep't*, 73 F.4th 678, 691 (9th Cir. 2023). Taken together, the relevant considerations, including the *Graham* factors, weigh in Tharp's favor.

Plaintiff argues that the *Graham* factors weigh in Honeycutt's favor. (Pl.'s Resp. at 7-9.) Plaintiff emphasizes that Honeycutt's "initial crimes" were traffic violations and that "at worst," Honeycutt committed "a Class C felony, the least severe felony under Oregon law." (*Id.* at 8; *cf.* Defs.' Mot. at 14, arguing that there was "probable cause" to believe that Honeycutt "committed at least three crimes," including a "[C]lass C felony" of "[f]leeing or attempting to elude a police officer").

"[T]raffic violations are categorically minimal offenses and 'generally will not support the use of a significant level of force.'" *Seidner v. de Vries*, 39 F.4th 591, 599-600 (9th Cir. 2022) (quoting *Bryan*, 630 F.3d at 828). Plaintiff, however, fails to recognize that Tharp used only minimal force, not a "significant level," and never used any force until after Honeycutt sped away from Sanders' initial attempted stop, drove over spike strips, through a stop sign, sped down the wrong lane, and tried to elude Roach's subsequent attempt to stop his vehicle, all of which resulted in Roach executing a PIT maneuver and tackling Honeycutt to the ground. (*See* Pl.'s Resp. at 7-9.) Immediately thereafter, Honeycutt resisted arrest and Tharp responded with minimal force.

Honeycutt's attempts to elude and resisting arrest are significant, as the relevant case law confirms. In *Seidner*, for example, the plaintiff was "riding his bicycle on a quiet residential street . . . without a light" (a "bicycle-light violation" under state law), there was "no evidence that [the plaintiff] posing a risk to [the officer] or anyone else," and the officer used "a roadblock to stop" the plaintiff from fleeing. 39 F.4th at 594-95, 599. The Ninth Circuit held that the

officer's "roadblock was use of intermediate force" and the second and "most important" *Graham* factor (whether the suspect posed an immediate threat to safety of the officer or others) favored the plaintiff. *Id.* Turning to the first *Graham* factor, the Ninth Circuit explained that "traffic violations are categorically minimal offenses and generally will not support the use of a significant level of force . . . [b]ut what [the plaintiff] fail[ed] to acknowledge [was] that the roadblock was not used until after he tried to pedal away and evade contact with [the officer]," which was "a separate legal violation." *Id.* at 599 (simplified).

The Ninth Circuit also explained the plaintiff's "flight" was "part of" the third *Graham* factor (whether the suspect was actively resisting arrest or attempting to evade arrest by flight), "making it an independent consideration in assessing the strength of the government's interest in affecting an investigatory stop or arrest." *Id.* at 599-600 (citing *Williamson*, 23 F.4th at 1153). The Ninth Circuit observed that "[a] minor offense, even a traffic violation, followed by an attempt to flee gives law enforcement a greater measure of interest in affecting a stop[,]" "flight increases the government's interest to use force to 'stop a suspect and show that flight from the law is no way to freedom,'" and "active flight at the time of arrest favors the government's use of force[.]" *Id.* at 600 (first citing and quoting *County of Sacramento v. Lewis*, 523 U.S. 833, 853 (1998); and then citing *Miller v. Clark County*, 340 F.3d 959, 965-66 (9th Cir. 2003)). For these reasons, the Ninth Circuit held that "factors one and three favor[ed] the government to some degree." *Id.*

In addition to the *Graham* factors, the Ninth Circuit also "consider[ed] whether there were 'less intrusive alternatives to the force employed and whether proper warnings were given[,]'" and the "unique challenges" that law enforcement confronts when "a person flee[s] on a bicycle," which "highlight[ed] the 'split-second judgments' that officers must make in 'rapidly

evolving' situations[.]" *Id.* (first quoting *Rice*, 989 F.3d at 1122; and then quoting *Scott*, 39 F.3d at 914). With respect to lesser alternatives, the Ninth Circuit noted that the officer "activated his overhead lights, stopped his patrol car, and got out to talk" to the plaintiff, and that the plaintiff "did not" do so but if he "[h]ad . . . cooperated with [the officer's] efforts to speak with him and not taken off, there would have been no need for force." *Id.* With respect to the situation's unique challenges, the Ninth Circuit could not "ignore the reality" that when "a person flee[s] on a bicycle" they are able to move "faster than a person on foot and . . . maneuver through obstacles and conditions that vehicles cannot," and that the officer "could have pulled further ahead before blocking the roadway but doing so may have resulted in [the plaintiff] changing course, not stopping." *Id.*

Taking all these "relevant considerations together," the Ninth Circuit held that the government had "an interest justifying some use of force to stop [the plaintiff] from fleeing even though the incident initially arose from a minor traffic violation," and "[t]o conclude otherwise would hamstring law enforcement officers in trying to hold suspects on bicycles accountable for unlawful conduct." *Id.*

Like the plaintiff in *Seidner*, Plaintiff fails adequately to acknowledge that Tharp did not drive up to Scouter Mountain Road's dead end or attempt physically to restrain Honeycutt until after Honeycutt committed separate legal violations, including, but not limited to, fleeing or attempting to elude law enforcement and actively resisting arrest. (*See* Pl.'s Resp. at 8, 14, conceding both legal violations). Honeycutt's flight and active resistance are "part of" the third *Graham* factor, and therefore provide "independent consideration[s] in assessing the strength of the government's interest in affecting . . . [a] stop or arrest." *Seidner*, 39 F.4th at 600 (citing *Williamson*, 23 F.4th at 1153). Ultimately, Honeycutt's conduct gave the CCSO deputies "a

greater measure of interest in affecting a stop" and arrest and "favor[ed]" the deputies' "use of force." *See Seidner*, 39 F.4th at 600 (first citing *Lewis*, 523 U.S. at 853; and then citing *Miller*, 340 F.3d at 965-66); *cf. Bernal*, 73 F.4th at 692-93 (granting summary judgment in the deputies' favor and noting that "the government's interest in detaining . . . a non-suspect witness[] was at a low ebb, [and] so too was the accompanying right to use physical force" but "any threat to officer safety was minimal and quickly mitigated" and the deputies only "briefly applied among the lowest levels of force possible").

The Court also considers whether there were "less intrusive alternatives to the force employed and . . . proper warnings were given," *Rice*, 989 F.3d at 1122, and challenges unique to this specific case, including "split-second judgments" that the CCSO deputies needed to make because of Honeycutt's conduct and a "rapidly evolving" situation. *See Seidner*, 39 F.4th at 600 (same).

Before Tharp engaged in any of the complained-of actions, Sanders activated his overhead lights and siren and attempted to stop Honeycutt's truck, Honeycutt sped away and attempted to flee, and Tharp learned "about . . . Honeycutt's efforts to elude[.]" (Tharp Decl. ¶ 3.) Even if Tharp flushed Honeycutt down the road and over spike strips, which were designed for safety and allowed Honeycutt to maintain control of and continue driving his truck, Tharp stayed in and pulled to the shoulder of his lane of travel, allowed Honeycutt to proceed, and never attempted to block Honeycutt or obtain the authorization necessary to do so. (Tharp Dep. 44:19-45:24.) Tharp followed in the distance as Honeycutt ran a stop sign, sped down the wrong lane, attempted to flee from a second stop, and resisted despite Roach's PIT and takedown. (Tharp Decl. ¶¶ 3-7.) At that point, Tharp made split-second judgments in a rapidly evolving situation involving a suspect who seemed "desperate to avoid arrest" and was being ordered to

drop a gun. (*Id.*; *see also* Tharp Dep. 18:2-13, 20:22-21:25, describing a potentially "precarious position" that Tharp attempted to navigate as Honeycutt resisted and Tharp heard a deputy yell "gun"; Lafky Decl. Ex. 4 & Pl.'s Resp. at 4-5, 12-13, showing that Honeycutt actively resisted and held a gun despite all the previous, less intrusive alternatives and being ordered to drop the gun).

It is clear that Tharp (and the other deputies) considered and employed less intrusive alternatives and Tharp used only minimal force, but Honeycutt refused to cooperate, forced deputies to make "split-second judgments" in an escalating and "rapidly evolving" situation, and resisted arrest while holding a gun. *See Seidner*, 39 F.4th at 600 (quoting *Scott*, 39 F.3d at 914). On balance, then, the Court finds that all the relevant considerations, including the *Graham* factors, favor Tharp. *Cf. Bernal*, 73 F.4th at 692-93 (affirming the grant of summary judgment in favor of the deputies where "any threat to officer safety was minimal and quickly mitigated," the deputies only "briefly applied among the lowest levels of force possible," and the "government's interest in detaining . . . a non-suspect witness[]" and "the accompanying right to use physical force" was "at a low ebb"); *Ramsey*, 2025 WL 66048, at *1-2 (noting that the "record [did] not indicate that [the autistic plaintiff] posed an immediate threat to [the officer] or others," and the plaintiff "resisted being restrained" but also made no "violent moves toward the officer" and there was "no indication that [the plaintiff] was armed"); *Bryan*, 630 F.3d at 829 (finding "no substantial government interest in using significant force to effect [an] arrest" for "misdemeanor violations").

### c.    Balance of Interests

Finally, the Court considers "the balance between the gravity of the intrusion on the individual and the government's need for that intrusion." *Williamson*, 23 F.4th at 1151. Like Bento's use of force, the Court finds that the "ultimate question of reasonableness is . . . properly

decided as a matter of law," because the Court can "say that a jury would be compelled to conclude that the way [Tharp] used his car [and body in attempting] to stop [Honeycutt] from fleeing [and resisting arrest] was reasonable," and because "[t]he balancing of competing interests . . . clearly favor[s]" Tharp. *See Seidner*, 39 F.4th at 600 (finding the opposite and a jury question where the officer used "intermediate force" and had only a "minimal" interest absent an "attempt to flee"). Thus, Tharp is entitled to summary judgment on Honeycutt's excessive force claim.

### 3.    Roach's Use of Force

Consistent with its evaluation of the other CCSO deputies' use of force and application of "*Graham*'s three-step balancing framework," *Rice*, 989 F.3d at 1124, the Court concludes that Roach's actions were also objectively reasonable.

### a.    Preliminary Matters

Plaintiff suggests that Honeycutt's excessive force claim against Roach is based primarily, if not exclusively, on Roach's physical strikes. Plaintiff, for example, argues that Roach's pursuit violated the CCSO's recently updated pursuit policy (not Honeycutt's Fourth Amendment rights), and that Roach executed a PIT maneuver or "uncontrolled stop" during that pursuit, which presented a "strong" risk of injury. (*See* Pl.'s Resp. at 9-11.) Plaintiff, however, only explicitly argues that Roach "engaged in excessive force when he punched . . . Honeycutt multiple times in the head and neck area," and that Roach's strikes constituted a "severe" "intrusion into . . . Honeycutt's right to not be savagely beaten[.]" (*Id.*) (simplified). Plaintiff adds that Roach's "several blows" to Honeycutt's head presented a "high" risk of injury. (*Id.* at 10.)

Defendants interpret Plaintiff's arguments similar to the Court. Defendants note that they "do not dispute" that Roach's "PIT maneuver was a use of force," but argue that Plaintiff failed

to present "any evidence that the PIT was performed improperly or . . . resulted in any injury
to . . . Honeycutt" and the video reflects that Roach's PIT "safely br[ought] . . . Honeycutt's
vehicle to a stop" and Honeycutt "immediately r[an] from the video showing no sign of injury."
(Defs.' Reply at 6-7.) Defendants also emphasize that Plaintiff must prove that Roach violated
Honeycutt's constitutional rights, not simply that Roach violated the County's policy. (*Id.* at 5.)

        **b.**        **Pursuit Policy Violation**

With respect to the CCSO's recently updated pursuit policy, the Court notes that Plaintiff
treats as distinct Roach's alleged policy violation and Honeycutt's right to be free from excessive
force. (*See* Pl.'s Resp. at 11, "Roach's violation of that right [to be free from excessive force]
and his violation of department policy does not permit him to seek qualified immunity."). The
Court agrees with Defendants that even if Roach violated the CCSO's updated pursuit policy,
Plaintiff may not hold Roach liable under Section 1983 for doing so. *See Cousins v. Lockyer*, 568
F.3d 1063, 1070 (9th Cir. 2009) (holding that "state departmental regulations do not establish a
federal *constitutional* violation," and "[t]here is no § 1983 liability for violating [a] policy[;
rather, a plaintiff] must prove that [the official] violated his constitutional right" (quoting *Case v.
Kitsap Cnty. Sheriff's Dep't*, 249 F.3d 921, 930 (9th Cir. 2001), which quoted *Gardner v.
Howard*, 109 F.3d 427, 430 (8th Cir. 1997))); *cf. Case*, 249 F.3d at 929 (stating that "any state
violation of its own policy is 'irrelevant' to the question of whether state officials are entitled to
qualified immunity" (quoting *Backlund v. Barnhart*, 778 F.2d 1386, 1390 n.5 (9th Cir. 1985))).

Accordingly, the Court finds that Roach is entitled to summary judgment to the extent
Plaintiff bases his excessive force claim on Roach's alleged violation of the CCSO's pursuit
policy. *See Osborne v. Peters*, No. 22-35663, 2024 WL 239951, at *1 (9th Cir. Jan. 23, 2024)
(holding that the plaintiff "failed to raise a genuine dispute of material fact as to whether [the]
defendants violated [his] constitutional rights," and noting that a "failure to follow prison policy

[did] not establish a federal constitutional violation" (citing *Cousins*, 568 F.3d at 1070)); *cf.*
*Bonilla-Chirinos v. Maggiano*, 776 F. App'x 520, 521 (9th Cir. 2019) (holding that police
officers were entitled to qualified immunity and noting that this circuit has "explained previously
that 'whether the officers violated a state law or an internal departmental policy is not the focus
of [such an] inquiry'" (brackets omitted) (quoting *Case*, 249 F.3d at 929)); *Bannon v. Godin*, 99
F.4th 63, 86 n.25 (1st Cir. 2024) ("Nor does the fact that the PIT maneuver violated [the police
department's] policy strip [the officer] of [qualified] immunity." (citing *Davis v. Sherer*, 468
U.S. 183, 194-96 (1984))), *cert. denied*, --- S. Ct. ---- , 2025 WL 76439, at *1 (U.S. Jan. 13,
2025).

### c.    PIT Maneuver

To the extent Plaintiff bases his excessive force claim on Roach's PIT maneuver, the
Court concludes that Roach is entitled to qualified immunity and does not reach the question of
whether Roach's PIT maneuver violated the Fourth Amendment.

### 1)    Applicable Law

"The doctrine of qualified immunity protects government officials from § 1983 liability
'unless (1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of
their conduct was clearly established at the time.'" *Williams*, 112 F.4th at 642 (quoting *Dist. of
Columbia v. Wesby*, 583 U.S. 48, 62-63 (2018)). Courts "may consider the two prongs of the
qualified immunity analysis in any order." *Id.* (quoting *Chism v. Washington*, 661 F.3d 380, 386
(9th Cir. 2011)).

### 2)    Analysis

A sister circuit recently addressed a procedural situation comparable to the one presented
here. In *Bannon*, the plaintiff sued a police officer under Section 1983 and asserted excessive
claims based the officer's "use of [a] PIT maneuver to try to stop to [the decedent's] car with his

cruiser." 99 F.4th at 86. In reviewing the district court's entry of summary judgment, the First

Circuit "affirm[ed] based on qualified immunity" and "[w]ithout decision whether [the officer's]

conduct violated the Fourth Amendment[.]" *Id.* In support, the First Circuit observed that the

plaintiff's "brief [did] not identify any precedent on this issue finding a Fourth Amendment

violation at all, citing instead two decisions dealing with alleged due process violations, neither

of which involved an intentional police cruiser collision with a fleeing, armed suspect under

circumstances like those presented [in *Bannon*]." *Id.* (citations omitted). The First Circuit

explained that the plaintiff's "failure end[ed] her appeal on th[at] claim," because she had "not

met her burden of "identifying either controlling authority or a consensus of persuasive authority

sufficient to put [the officer] on notice that his conduct fell short of the constitutional norm." *Id.*

(simplified).

In a footnote, the First Circuit also observed that the plaintiff did "not contend an alleged

constitutional violation was so 'obvious' that 'any competent officer would have known that the

[PIT] maneuver would violate the Fourth Amendment,' . . . nor could she plausibly do so"

because the Supreme Court has held that "it is at least sometimes reasonable for an officer to

intentionally collide with a suspect's vehicle during a pursuit[.]" *Id.* at 86 n.25 (brackets omitted)

(first quoting *Kisela v. Hughes*, 584 U.S. 100, 106 (2018); and then citing *Scott*, 550 U.S. at 374,

386)).

Similarly here, Plaintiff does not and cannot contend that it was "so obvious" that any

competent officer would have known that Roach's PIT maneuver (or its equivalent) violated the

Fourth Amendment. (*See* Pl.'s Resp. at 9-11, addressing Roach's allegedly excessive force and

qualified immunity). Plaintiff bears but failed to meet his "burden of pointing to prior case law

that articulates a constitutional rule specific enough to alert these officers in this case that their

particular conduct was unlawful." *Wilkins v. Herron*, No. 24-80, 2024 WL 5200177, at *2 (9th Cir. 23, 2024) (quoting *Hughes v. Rodriguez*, 31 F.4th 1211, 1223 (9th Cir. 2022)). Plaintiff was "not required to cite 'a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate.'" *Id.* (quoting *Mullenix v. Luna*, 577 U.S. 7, 12 (2015)).

Plaintiff, however, cites no case law placing the constitutionality of Roach's PIT maneuver (or its equivalent) beyond debate. (*See* Pl.'s Resp. at 9-11.) Plaintiff cites only one case (*Scott*) involving an officer's intentional collision with a suspect's vehicle, but he does so in arguing that the risk of Roach's strikes was "high." (*Id.* at 10, citing *Scott*, 550 U.S. at 383). Although the factual circumstances in *Scott* bear little resemblance to this case, *Scott* recognized that "it is at least sometimes reasonable for an officer to intentionally collide with a suspect's vehicle during a pursuit[.]" *Bannon*, 99 F.4th at 86 n.25 (citing *Scott*, 550 U.S. at 374, 386).

In *Scott*, the officer explained that he "decided not to employ the PIT maneuver because he was concerned that the vehicles were moving too quickly to safely execute the maneuver," the government "[r]espondent agree[d] that the PIT maneuver could not have been safely employed," and the Supreme Court noted that it was "irrelevant to [its] analysis whether [the officer received] permission to take the precise actions he took." 550 U.S. at 375 n.1 (simplified). Instead of executing a PIT maneuver on the suspect's vehicle, which a deputy initially clocked at seventy-three miles per hour and fled at speeds exceeding eighty-five miles per hour, the officer "[a]pplied his push bumper to the rear of [suspect's] vehicle[,]" and "[a]s a result, [the suspect] lost control of his vehicle, which left the roadway, ran down an embankment, overturned, and crashed." *Id.* at 375. The suspect was "badly injured" and "rendered a quadriplegic." *Id.* Despite it being "clear" that the officer's "ramming [of the suspect] off the road" "posed a high

likelihood of serious injury or death," the Supreme Court had "little difficulty in concluding it was reasonable for [the officer] to take the action that he did." *Id.* at 384-85; *see also id.* at 380 n.7 ("The videotape validates the [lower] court's statement that when [the officer] rammed [the suspect's] vehicle it was not threatening any other vehicles or pedestrians. (Undoubtedly [the officer] *waited* for the road to be clear before executing his maneuver.)").

Given these facts and observations, the Court concludes that Roach is entitled to summary judgment on Plaintiff's excessive force claim to the extent it is based on Roach's PIT maneuver because Plaintiff failed to meet his "burden of pointing to prior case law that articulates a constitutional rule specific enough to alert [Roach that his] particular conduct was unlawful." *Wilkins*, 2024 WL 5200177, at *2 (quoting *Hughes*, 31 F.4th at 1223). Plaintiff's "failure end[s]" the Court's inquiry. *See Bannon*, 99 F.4th at 87 (same); *cf. Sabbe*, 84 F.4th at 812, 21-22 (noting that an "unmarked Commando V150 armored personnel carrier," which had "eight officers inside" and "weigh[ed] several times as much as a typical police cruiser," executed two "PIT maneuver[s], intentionally colliding with [the plaintiff's] pickup, crushing the truck's body and spinning it around in an attempt to stop the truck by causing its engine to stop," and stating that it was "not clear that a reasonable jury could find" that the first PIT maneuver "constituted deadly force" when it occurred "at low speed," did not contact the cab, "spun the truck 180 degrees but did not disable it," and "damaged [the plaintiff's] truck more severely than might have been expected had it had been executed with a regular police cruiser under similar circumstances," i.e., "the impact bent the truck's bed inward, mangled the tailgate, and partially detached the rear bumper").

///

///

### d.    Physical Strikes

#### 1)    Type and Amount of Force

With respect to Roach's physical strikes, this Court has previously recognized that an officer's knee strikes on an arrestee lying prone on the ground constitutes an "intermediate" use of force. *See Barror v. City of St. Helens*, No. 3:20-cv-00731-SB, 2023 WL 5353346, at *4 (D. Or. June 12, 2023) (collecting cases), *findings and recommendation adopted as modified on other grounds*, 2023 WL 5350755, at *1-2 (D. Or. Aug. 18, 2023); *see also Barror v. City of Saint Helens*, No. 3:20-cv-00731-AN, 2024 WL 1158336, at *6 (D. Or. Mar. 18, 2024) (reiterating that "there is a general consensus from district courts in the Ninth Circuit that knee strikes are, at a minimum, an intermediate level of force: in addition to the cases cited in the [previous findings and recommendation]") (citations omitted). "Courts in the Ninth Circuit classify closed fist strikes—or punches—as examples of significant intermediate uses of force." *Applegate v. Baines*, No. 3:23-cv-01368-SI, 2025 WL 392588, at *6 (D. Or. Feb. 4, 2025) (simplified).

There are several noteworthy facts relevant to the Court's assessment of "both 'the risk of harm and the actual harm experienced.'" *Sabbe*, 84 F.4th at 821 (quoting *Nelson*, 685 F.3d at 879). First, the Court cannot determine precisely where all of Roach's strikes landed on Honeycutt's body, but it appears evident that Roach's strikes softened and shortened within seconds as deputies arrived to assist. (*See* Lafky Decl. Ex. 4, showing Roach's strikes between the 1:12 and 1:24 marks; *cf.* Ciecko Decl. Ex. 106 at 4, noting that the examiner listed "[o]ther injuries" of unspecified origin and described "[s]everal small abrasions and cuts . . . on the forehead and scalp in an area measuring [about four-and-a-half by three inches]," a small "abrasion . . . on the skin lying over the right pubic bone," and "[s]everal faint contusions . . . on various body surfaces").

Second, several of Roach's strikes appear to have landed on the side of Honeycutt and in a short and/or hammer-like manner and effort to obtain control of Honeycutt's arm. (*See* Lafky Decl. Ex. 4.) Third and finally, although Roach was "not 100 percent certain" on the timing, Roach testified that Honeycutt stated that he a gun around the time that he tackled Honeycutt, who then began resisting arrest. (*See* Roach Dep. 15:2-21, 20:8-21:21, 23:23-24:11 & Roach Decl. ¶¶ 4-11, covering the relevant testimony, time period, and strikes; Tharp Dep. 17:8-13, 19:15-20:7, describing what Tharp could see "out of [his] peripheral" in terms of Roach's strikes and lack of control of "any part" of Honeycutt's body; *see also* Pl.'s Resp. at 12, acknowledging that post-tackle, Honeycutt "was resisting" arrest). There is no dispute that Honeycutt was holding a gun around this time. (*See* Pl.'s Resp. at 13, arguing that Bento had "control over [Honeycutt's] hand with the gun in it"; *id.* at 4-5, arguing that Bento was "able to push [Honeycutt's] gun away from him[self]").

Consistent with the foregoing case law, the Court concludes that Roach's strikes were an intermediate use of force. Defendants agree with this classification of Roach's strikes. (*See* Defs.' 17-18, citing *Barror* in support of Roach's "fist and knee strikes" being an "intermediate level of force").

### 2)    Government's Interest

"Intermediate force is 'the most severe force authorized short of deadly force,' . . . and 'must be justified by a commensurately serious state interest[.]'" *Applegate*, 2025 WL 392588, at *6 (first quoting *Smith*, 394 F.3d at 702; and then quoting *Young v. County of Los Angeles*, 655 F.3d 1156, 1163 (9th Cir. 2011)). The Court finds that Roach's use of force was justified.

Given the overlapping time period and immediate threat, the Court analysis of the *Graham* factors is largely the same as its deadly force analysis above. *See Hyer*, 118 F.4th at 1063 (addressing a deadly force claim and expert reports that "help[ed] create genuine disputes

PAGE 48 – OPINION AND ORDER

of material fact over whether the use of deadly force . . . was objectively reasonable," turning to a "chemical munitions" claim and classifying munitions as an "intermediate use of force," and stating that "the *Graham* analysis with respect to the first and third factors [was] largely the same as the deadly force analysis above"). There was more than a commensurately serious government interest because shortly after Roach tackled and heard Honeycutt state that he had a gun, Honeycutt began resisting arrest and holding a gun in Bento's direction, prompting Bento's warning, order to drop the gun, and shots. *Cf. Ramsey*, 2025 WL 66048, at *1-2 (noting that the "record [did] not indicate that [the autistic plaintiff] posed an immediate threat to [the officer] or others," and the plaintiff "resisted being restrained" but made no "violent moves toward the officer" and there was "no indication that [the plaintiff] was armed"); *Bryan*, 630 F.3d at 829 (finding "no substantial government interest in using significant force to effect [an] arrest" for "misdemeanor violations").

In sum, the Court incorporates its analysis above and finds that any facts favoring Honeycutt are outweighed by the immediacy of the threat that he posed and the split-second judgments that the deputies were required to make in a rapidly escalating and evolving situation. *See Seidner*, 39 F.4th at 600 (stating that this circuit has "held that the use of intermediate force must be justified by more than 'a minimal interest' held by the government" (quoting *Bryan*, 630 F.3d at 831)); *cf. Strickland*, 69 F.4th at 619-23 (holding that the "bulk of the *Graham* factors favor[ed]" the decedent but were nevertheless "outweigh[ed]" by "the immediacy of the threat that [he] posed").

### 3)     Balance of Interests

Finally, the Court must weigh Roach's "intrusion into [Honeycutt's] Fourth Amendment rights against [Roach's] interest in apprehending [and disarming Honeycutt]—that is, whether

there [was] a reasonable fit between [Roach's] use of force and [Honeycutt's] conduct." *Seidner,*
*39 F.4th at 600.*

The Court's balancing of competing interests also clearly favors Roach, and a jury would
be compelled to conclude that Roach's actions were reasonable. Thus, the Court finds that
reasonableness is properly decided as a matter of law. *See id.* (recognizing that reasonableness is
properly decided as a matter of law when "a jury would be compelled to conclude" as much and
a court's "balancing of competing interests . . . clearly favor[s] [the defendant officer] such that
he is entitled to judgment as a matter of law on this issue"). Accordingly, the Court enters
summary judgment in Roach's favor on Plaintiff's excessive force claim.

### C.    Conclusion

For these reasons, the Court grants Defendants' motion for summary judgment on
Plaintiff's excessive force claims.[13]

## II.    MUNICIPAL LIABILITY

Next, the Court turns to Plaintiff's municipal liability claim against the County. (*See* Pl.'s
Resp. at 13-14, addressing and describing Plaintiff's municipal liability theory; Defs.' Reply at
13, same).

### A.    Applicable Law

The Supreme Court's decision in "*Monell v. Department of Social Services*, 436 U.S.
658, 690-95 (1978), 'established that municipalities can be liable for infringement of
constitutional rights, under certain circumstances.'" *Williams*, 112 F.4th at 646 (quoting *Horton*
*ex rel. Horton v. City of Santa Maria*, 915 F.3d 592, 602 (9th Cir. 2019)). "Under *Monell*, a

---

[13] In light of the Court's findings that Defendants did not violate Honeycutt's
constitutional rights, the Court does not address Defendants' alternative argument that they are
entitled to qualified immunity (with the exception of the above discussion regarding Roach's PIT
maneuver).

municipality is liable for constitutional torts committed by its employees only if those torts were committed pursuant to the municipality's policies or customs." *Napouk*, 123 F.4th at 924 (citing *Henry v. County of Shasta*, 132 F.3d 512, 517 (9th Cir. 1997)). Thus, "[a] municipality is liable only if (1) 'the plaintiff possessed a constitutional right of which he was deprived;' (2) 'the municipality had a policy;' (3) 'th[e] policy amount[ed] to deliberate indifference to the plaintiff's constitutional right;' and (4) 'the policy [was] the moving force behind the constitutional violation.'" *Id.* (simplified) (quoting *Van Ort v. Est. of Stanewich*, 92 F.3d 831, 835 (9th Cir. 1996)).

B.      **Analysis**

The Court concludes that Defendants are entitled to summary judgment on Plaintiff's *Monell* claim.

Absent a constitutional violation, Plaintiff cannot prevail on his *Monell* claim. *See, e.g.*, *Napouk*, 123 F.4th at 924 (stating that "a constitutional violation is required for *Monell* liability" (citing *Hayes v. County of San Diego*, 736 F.3d 1223, 1231 (9th Cir. 2013))). Plaintiff agrees, but argues that "[t]here was constitutional deprivation" because the CCSO's policies subjected Honeycutt to excessive force." (Pl.'s Resp. at 13.) In support of this theory, Plaintiff argues that Bento used excessive force when he fatally shot "Honeycutt for traffic violations," the County "sanctioned" this conduct because its use of force manual states that "warnings must be given where feasible before [a deputy] use[s] deadly force," and Bento instead "[f]ollow[ed] his training" by failing to "give any warnings before using deadly force, even though [he had] plenty of time and . . . control over [Honeycutt's] hand with the gun in it." (*Id.*, citing the 1:26 to 1:32 marks of Lafky Decl. Ex. 4; *see also* Bento Dep. 52:7-12, discussing Bento's consideration of less intrusive alternatives and how deputies are trained to "meet the level of force [they are]

presented with, and at that time [Bento was] being presented with deadly force, . . . [and the deputies are] not trained . . . to meet that with a less lethal form of force").

Above, the Court "view[ed] the facts in the light depicted by the videotape," *Smith*, 81 F.4th at 997 (quoting *Scott*, 550 U.S. at 381), and found no constitutional violation based on the deputies' use of force. *Cf. Strickland*, 69 F.4th at 621-22 (noting that like Bento the defendant officers "command[ed] to 'drop the fucking gun'" and the decedent received "warnings to drop it," and explaining "[t]he pivotal moment occurred when [decedent] . . . point[ed] the replica gun in the officers' direction," because "[a]t that point, they had probable cause to believe that [the decedent] pose[d] a significant threat of death or serious physical injury to themselves and it became objectively reasonable for them to use lethal force," and as this circuit has "said, when a suspect points a gun in the direction of officers, they would be justified to use deadly force") (simplified). Accordingly, Plaintiff's *Monell* claim fails as a matter of law and the County is entitled to summary judgment. *See Williams*, 112 F.4th at 647 (noting that the plaintiff's *Monell* claims were "intertwined with the excessive force claim and qualified immunity defense" and "fail[ed] as a matter of law because [the Ninth Circuit] found no constitutional violation in the officers' use of force" (simplified) (citing *Huskey v. City of San Jose*, 204 F.3d 893, 906 (9th Cir. 2000)); *see also Napouk*, 123 F.4th at 924 (finding "no constitutional violation" and "affirm[ing] the district court's grant of summary judgment on the *Monell* claims" (citing *Hayes*, 736 F.3d at 1231)).

## III.    ASSAULT AND BATTERY CLAIMS

The Court also finds that Defendants are entitled to summary judgment on Plaintiff's assault and battery claims.

The parties agree that Plaintiff's assault and battery claims rise or fall with his excessive force claims but disagree on whether the latter should survive summary judgment. (*See* Pl.'s

Resp. at 15, addressing Plaintiff's assault and battery claims and arguing that Defendants rely on the "incorrect assumption" that they are entitled to summary judgment on Plaintiff's excessive force claims, "[q]ualified immunity is inappropriate," and Plaintiff's excessive force claims "should, as a matter of law, survive and therefore the state law claims must also survive"; *cf.* Defs.' Mot. at 25-26). Thus, the parties effectively agree that at least for present purposes, Plaintiff's excessive force, assault, and battery claims all turn on whether the CCSO deputies' use of force was objectively reasonable under the circumstances. (*See, e.g.*, Defs.' Reply at 14, maintaining that the "legal standards" are "effectively the same" and "each [claim] hinge[s] on reasonableness").

Consistent with this agreement and the analysis above, the Court finds that Plaintiff's assault and battery claims fail because the deputies' use of force was objectively reasonable under the circumstances. *See Williams*, 112 F.4th at 646-47 (describing how Nevada battery law mirrored the federal excessive force standards, reversing the denial of summary judgment, and holding that "[b]ecause the officers' use of force was not unreasonable, the battery claim fail[ed]" (citing *Monzon v. City of Murrieta*, 978 F.3d 1150, 1164 (9th Cir. 2020) (California law))). Thus, the Court grants Defendants' motion for summary judgment on Plaintiff's assault and battery claims.

## IV.    NEGLIGENCE

Defendants are also entitled to summary judgment on Plaintiff's remaining negligence claim.

The CCSO deputies did not breach any duty of care to Honeycutt because the deputies' use of force, including Bento's use of deadly force, was objectively reasonable under the circumstances. Even if the Court's reasonableness inquiry is not identical under the Fourth Amendment and Oregon negligence law and the Court engaged in a broader inquiry that

PAGE 53 – OPINION AND ORDER

encompassed other actions preceding the deputies' use of force, the Court would nevertheless conclude that the deputies did not breach any duty to Honeycutt when they were forced to make split-second judgments and left with only an instant to act in a rapidly escalating and evolving situation. *See Rice v. City of N. Las Vegas*, No. 23-2935, 2024 WL 4616201, at \*3 (9th Cir. 2024) (addressing Nevada law before turning to a broader, alternative inquiry under California law and holding that "the defendants did not breach any duty of care to [the decedent] because [the officer's] use of lethal force was reasonable," and "[e]ven assuming that the reasonableness inquiry under the Fourth Amendment [was] not identical to the reasonableness inquiry under [state] negligence law[,] . . . the totality of the circumstances surrounding [the] use of deadly force leads [this circuit] to conclude that the defendants did not breach any duty to [the decedent]") (simplified); *cf. Napouk*, 123 F.4th at 924 (rejecting negligence and battery claims based on a state discretionary immunity statute and noting this circuit had "already determined that the officers acted reasonably and there [was] no evidence that they acted with bad faith").

For these reasons, the Court grants Defendants' motion for summary judgment on Plaintiff's negligence claim.[14]

///

///

///

_____

[14] Alternatively, Defendants are entitled to summary judgment on Plaintiff's state law claims because (1) Plaintiff failed adequately to address or rebut Defendants' argument that Oregon Revised Statutes § 31.180 bars Plaintiff's state law claims (*see* Defs.' Mot. at 22-23; *cf.* Pl.'s Resp. at 14; Defs.' Reply at 14); and (2) in a recent and sufficiently similar deadly force case, this Court held that the defendants were entitled to a complete defense under this statute. *See Spangler v. Polk County*, No. 3:21-cv-01378-SB, 2024 WL 5416189, at \*11-13 (D. Or. Nov. 18, 2024), *findings and recommendation adopted*, 2025 WL 552644, at \*1 (D. Or. Feb. 18, 2025). CCSO is also entitled to dismissal with prejudice because it is not a proper defendant. *See id.* at \*15 (same).

**CONCLUSION**

For the reasons stated, the Court GRANTS Defendants' motion for summary judgment

(ECF No. 14).

**IT IS SO ORDERED.**

DATED this 10th day of March, 2025.

HON. STACIE F. BECKERMAN
United States Magistrate Judge

PAGE 55 – OPINION AND ORDER